| | |
|---|---|
| **District Court, Denver County, State of Colorado**<br>Court Address:<br>1437 Bannock Street, Room 256 Denver, CO 80202<br>Phone: 720-865-7800 | DATE FILED: April 25, 2014 1:56 PM<br>FILING ID: 56323A9F27C61<br>CASE NUMBER: 2014CV31698 |
| **Plaintiff:**<br>REGINA GARCIA as Parent and Next Friend to T.D., a minor.<br><br>v.<br><br>**Defendants:**<br>KELCEY PATTON and THE DENVER DEPARTMENT OF HUMAN SERVICES. | ▲ COURT USE ONLY ▲<br><br>Case No:<br><br>Div: |
| **Plaintiffs' Attorneys:**<br>ALLEN & VELLONE, P.C.<br>Jordan Factor (#38126)<br>James S. Helfrich (#22626)<br>1600 Stout Street, Suite 1100<br>Denver, CO 80202<br>Telephone: (303) 534-4499<br>Fax: (303) 893-8332<br>jfactor@allen-vellone.com<br>jhelfrich@allen-vellone.com<br><br>HUTCHINSON, BLACK & COOK, LLC<br>Baine P. Kerr (#9797)<br>921 Walnut Street, Suite 200<br>Boulder, CO 80302<br>Telephone: (303) 442-6514<br>Fax: (303) 442-6593<br>kerr@hbcboulder.com | |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Regina Garcia as Parent and Next Friend to T.D., a minor, for her Complaint against Kelcey Patton and the Denver Department of Human Services alleges and states:



# INTRODUCTION

1.      Defendants removed T.D. from his mother's home, assumed custody of him and responsibility for his care at a time when he had extraordinary emotional and psychological needs, and then knowingly placed him for a year in the home of his biological father, a registered sex offender who had been convicted of raping his minor daughter, T.D.'s sister. Defendants made this decision knowing that placement with a convicted child rapist posed a risk of harm to T.D. Over the ensuing year, though T.D. remained a ward of Denver County, Defendant Patton failed to appropriately monitor the placement and ignored signs that T.D. was being sexually abused by his father. Indeed, throughout the course of the year, T.D. was repeatedly forced to perform fellatio on his father and was forced to perform sex acts on a younger child in front of his father and for his father's sexual gratification, for which his father has subsequently been convicted and imprisoned. Moreover, Defendant Patton observed and noted that T.D. was being subjected to ongoing physical abuse by his father, but nevertheless recommended that T.D. remain placed in his father's home. It is only when Jefferson County, in which the father's home was located, launched an independent investigation that uncovered the ongoing child sexual abuse and removed the other minor children from the home, that Defendants belatedly removed T.D. Defendants' actions violated T.D.'s constitutional rights, for which he now seeks redress.

# PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Regina Garcia is mother of T.D., a minor, has parental rights over T.D., and, along with T.D., is a resident of the State of Colorado.

3.      Defendant Kelcey Patton, at all times relevant to this Complaint, was a caseworker employed by the Denver Department of Human Services, and is a resident of the State of Colorado.

4.      The Denver Department of Human Services ("the Department") is a political subdivision of the State of Colorado.

5.      This Court has concurrent jurisdiction with federal courts to adjudicate claims arising under 42 U.S.C. § 1983.

6.      Venue is appropriate pursuant to C.R.C.P. 98(c).

# GENERAL ALLEGATIONS

7.      On April 9, 2010, the Department filed a petition in dependency and neglect, verified by Patton, alleging, among other things, that T.D. has been truant from school.

2

8.      The Department further alleged that T.D.'s father ("Father") "has had a sexual offense against a minor . . . . The victim was [P.G.], Ms. Garcia's oldest daughter."

9.      Prior to filing the petition, the Department noted in its internal records that Father was a "registered sex offender." Another internal record notes that "[o]ther children in the home . . . have been abused by FOC [Father of Child]. FOC –is registered sex offender and doesn't have contact w/kids."

10.      At the time the Department filed the petition, T.D. resided in his mother's home.

11.      On April 4, 2010, the Denver District Court sustained the petition and entered judgment in favor of the Department and against Father and Ms. Garcia. The court adjudged T.D. and his sister, M.D., dependent and neglected.

12.      Pursuant to the court's April 4, 2010 order, legal custody of T.D. was placed with the Department.

13.      The court ordered that T.D. be placed in a Therapeutic Residential Child Care Facility.

14.      Placement in a Therapeutic Residential Child Care Facility was necessary and appropriate for T.D. given his extraordinary therapeutic needs.

15.      In May 2010, shortly after the Department obtained custody of T.D., Patton reported to the court "that three prior sexual abuse investigations within the Garcia family had taken place," that "[t]he family has a history of sexual abuse within the family. The family has also had multiple child protection referral inquiries. It is evident that [T.D.] is in need of mental health treatment and is beyond the control of Ms. Garcia."

16.      Patton further reported in May 2010 that "[P.G.] was sexually abused by her stepfather [Father]. [Father] was incarcerated for 2 years for sexual assault on a child. Ms. Garcia reports that she took out a restraining order to keep [Father] away from her family."

17.      Patton also reported in May 2010 that "[T.D.] has issues with anger and enuresis." Enuresis, coupled with anger and the suicidal ideation that he had recently expressed, are signs that a child has been a victim of child sexual abuse.

18.      The court subsequently ordered, on May 12, 2010, that Father was not to have visits with M.D. until recommended by M.D.'s therapist and by Father's

parole officer.  Presumably, this limitation was due to Father's history of committing child sexual abuse.

19.    Despite her knowledge that Father presented a significant risk of immediate harm to T.D., Patton recommended in September 2010 that T.D. be placed in Father's home.

20.    Prior to recommending that T.D. be placed in Father's home, Patton failed to require that an appropriate risk assessment be performed and evaluated.

21.    Moreover, given T.D.'s extraordinary emotional and psychological needs, he required placement in a Therapeutic Residential Child Care Facility. Transitioning him to placement in Father's house deprived T.D. of therapeutic care that he desperately needed, and ensured that his psychological health would be damaged even without ensuing re-traumatization.

22.    Based on Patton's recommendation, T.D. was placed in Father's home in October 2010.

23.    As T.D.'s assigned caseworker, Patton was required to monitor diligently T.D.'s placement in Father's home, including through face-to-face meetings with T.D. on at least a monthly basis and home visits at least every other month.

24.    Patton failed to monitor diligently T.D.'s placement in Father's home.

25.    Had she met regularly with T.D. and conducted regular visits to Father's home, Patton would have seen signs that T.D. was being subjected to ongoing sexual abuse by Father, including forcible oral penetration and being compelled to perform sex acts on his younger sibling.  Patton would also have observed evidence that Father was subjecting T.D. to ongoing physical abuse. Patton would have, or should have, removed T.D. from Father's home upon observing signs of T.D.'s abuse.

26.    Instead, Patton appears to have based her assessment of T.D.'s well-being primarily on Father's reporting.  In her March 2011 report to the court, Patton states that Father "reports that [T.D.] is growing into a happy and health[y] teenager; that enjoys talking on the phone and occasionally entertaining his younger siblings.  Overall it appears that [T.D.] continues to flourish in [Father's] home."

27.    Therefore, Patton recommended that T.D. remain in Father's home.

28.    Patton began receiving reports from third parties of Father's mistreatment of T.D.

29.    In her June 2011 report, Patton notes that "[T.D.] visits Ms. Garcia on the weekends. Ms. Garcia informed this worker . . . that [T.D.] often smells bad and his clothing is unclean when he arrives at her home. Ms. Garcia expressed her concern for [T.D.] and questions if all of [T.D.'s] needs are being met. Recently, this worker was contacted by the school social worker at [T.D.'s] school. The school social worker informed this worker [Patton] that the school staff had some concerns regarding [T.D.'s] behavior and educational achievements. The school social worker detailed that in the last few months of school [T.D.] spent a large amount of time at the nurse's office complaining that he was sick or had body aches . . . . [T]he school staff reports that [T.D.] appears to be fearful of [Father] and at times does not want to go home."

30.    These reports—foul odor, unclean clothing, complaints of sickness and body aches, expressed fear of Father, and refusal to go back to Father's home—were obvious red flags that T.D. was being subjected to ongoing abuse and neglect by Father. These reports were made by credible third parties, including the school social worker and school staff.

31.    Moreover, T.D. himself reported being the victim of ongoing physical abuse by Father. As Patton reported in June 2011, "[T.D.] detailed that [Father] had hit [T.D.] with a wooden handle of a mop across his back. [T.D.] reports that the incident occurred because he had not completed his kitchen chore. [T.D.] claims that the following day, [Father] came home with a leather belt and told [T.D.] that if her [sic] did not behave [Father] would use the belt to punish [T.D.]"

32.    Patton should have taken steps to terminate T.D.'s placement with Father. Instead, Patton recommended that T.D. remain in Father's home.

33.    The court ordered the Department on June 28, 2011 "to line up a professional to go to [Father's] home and assess his parenting skills with his other children."

34.    Patton failed to do so. Had she done so, the professional would have discovered that T.D. was being subjected to ongoing abuse.

35.    The evidence that Patton already had of T.D.'s abuse by Father should have caused Patton to personally investigate Father's home and his treatment of T.D. However, as Patton reported in August 2011, Father's "communication with this worker has subsided. This worker went a period of time not being able to contact [Father] and this worker was unable to complete a face to face contact with [T.D.] for the month of July." Patton requested that Father sign a release so that

his sex offense therapist could speak with M.D.'s therapist about whether visits with Father would be safe for M.D.  However, Father refused to sign the release.

36.    That Father refused contact with Patton, and kept T.D. from seeing Patton, after Patton had received reports that T.D. was displaying signs of abuse and neglect, coupled with Father's refusal to allow his sex offense therapist to report on his progress, constituted an ominous sign that T.D. was being sexually and physically abused.

37.    Patton should have taken steps to terminate T.D.'s placement with Father.  Instead, Patton recommended yet again that T.D. remain in Father's home.

38.    In her November 2011 report, Patton states: "Since the last court hearing, this worker has had minimal contact with [Father].  Recently, this worker learned that [Father's] youngest children were removed from his care by Jefferson County social services."  Given that Jefferson County had removed Father's other children from the home, that Father "admits to this worker [Patton] that he uses crack cocaine," and that "[r]ecently, it was reported that [Father] has moved out of the state of Colorado," Patton finally concluded "that it was warranted to remove [T.D.] from [Father's] care as well."

39.    As Patton reported in November 2011, "[T.D.] was placed at the family Crisis Center (FCC) on an emergency basis.  While, being placed at the FCC [T.D.] has run from placement more than once . . . . This worker learned that [T.D.] obtained a municipal ticket for shop lifting when he was in the care of [Father].  [T.D.] is currently not in compliance with the municipal court orders and is at risk of further sanctions.  More importantly, during the investigation by Jefferson County, this worker was informed, that there may have [been] some inappropriate contact between [T.D.] and his younger siblings."

40.    It was only after terminating the placement with Father that Patton learned that T.D. had been cited months earlier for shoplifting.  It was only through the Jefferson County investigation that Patton discovered that T.D. had been involved in inappropriate sexual contact with his younger sibling.  Had Patton performed her duties appropriately, she would have learned these facts months earlier and would have, or should have, intervened to ensure that T.D. received the help he needed.

41.    As a result of the Jefferson County investigation, it was discovered that T.D. and a younger sibling had been engaged in sexual contact with each other at Father's direction.  Father was criminally charged for this conduct and has pled guilty.  T.D. was charged with a juvenile offense of Sexual Assault on a Child – Pattern of Abuse, and the court has ordered deferred adjudication and sentence.

42.    T.D. has suffered severe physical, emotional, and psychological harm as a result of his placement in Father's home.  He will have significant ongoing therapeutic and medical needs for the remainder of his life.  The lifelong effects of the harm that he has suffered will diminish considerably his earning potential.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983)

43.    Plaintiff incorporates all prior paragraphs as if fully restated herein.

44.    Patton is a state actor who at all times relevant to the allegations of this Complaint was acting under color of state law.

45.    Patton violated T.D.'s clearly established rights under the Due Process Clause of the United States Constitution.

46.    Patton had a special relationship with T.D. pursuant to which she was obligated to protect him from violent acts inflicted by others.

47.    Patton is liable for Father's harm of T.D. because Patton created the danger that caused the harm.

48.    Patton's conduct shocks the conscience.

49.    The law was sufficiently clear that a reasonable official in Patton's position would have understood that her conduct violated T.D.'s constitutional rights.

50.    In *Yvonne L. v. New Mexico Dep't of Human Services*, 959 F.2d 883 (10th Cir. 1992), the Tenth Circuit held that children in the state's legal custody have a clearly established "constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs." *Id.* at 893.

51.    The court held in *Yvonne L.* that "[i]f defendants knew of the asserted danger to plaintiff[ ] or failed to exercise professional judgment thereto, . . . and if an affirmative link to the injuries plaintiff[ ] suffered can be shown, then . . . defendants violated plaintiff['s] constitutional rights." *Id.* at 890.

52.    T.D. was in the state's legal custody.

53.    Patton was responsible for T.D. while he was in the state's legal custody.

54.    T.D. had a constitutional right to be reasonably safe from harm.

55.    Patton placed T.D. in Father's home, which she knew or suspected to be dangerous.

56.    T.D. was harmed in Father's home.

57.    Patton knew of the asserted danger to T.D. posed by placement in Father's home or failed to exercise professional judgment thereto.

58.    There is an affirmative link between T.D.'s injuries and Patton's knowledge of, or failure to exercise professional judgment with respect to, the dangers posed by placement in Father's home.

59.    In *Currier v. Doran*, 242 F. 3d 905, 923 (10th Cir. 2001), the Tenth Circuit held that even without a special relationship, "a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence."

60.    Here, the Department and Patton created the danger or increased T.D.'s vulnerability to the danger.

61.    T.D. was a member of a limited and specifically definable group.

62.    Pattons' conduct put T.D. at substantial risk of serious, immediate, and proximate harm.

63.    The risk was obvious or known.

64.    Patton acted recklessly in conscious disregard of that risk.

65.    Such conduct, when viewed in total, is conscience shocking.

66.    Patton was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow.

67.    Patton's actions constitute a conscious and unreasonable disregard of the consequences.

68.    If Patton had investigated T.D.'s case with sufficient acuity and diligence to discover the abuse, she would have been able to prevent further abuse by withdrawing T.D. from Father's home.

69.    Either through Patton's failure to investigate and report to the court or her affirmative recommendations to the court, Patton was responsible for the harm that Father caused T.D.

70.    On information and belief, at all times relevant to this Complaint Patton acted pursuant to policy and custom of the Department.

71.    Defendants' conduct caused Plaintiff to suffer damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against each Defendant, and award Plaintiff all relief allowed by law, including but not limited to the following:  (1) economic and non-economic losses on all claims allowed by law; (2) compensatory and consequential damages; (3) attorney's fees and costs; (4) pre-judgment and post-judgment interest; and (5) any further relief that this Court deems just and proper.

**Plaintiff requests trial by jury.**

Dated:        April 25, 2014

Respectfully submitted,

ALLEN & VELLONE, P.C.

/s/    *Jordan Factor*
Jordan Factor # 38126
James S. Helfrich #22626

-and-

Baine P. Kerr #9797
HUTCHINSON, BLACK & COOK, LLC

**Attorneys for Plaintiff**

Plaintiff's Address:

200 S. Hooker St.
Denver, CO 80219