**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Case No. 14-cv-01568-RM-MJW

REGINA GARCIA, as parent and next friend to T.D.,
T.D.,

      Plaintiffs,

v.

KELCEY PATTON,
THE DENVER DEPARTMENT OF HUMAN SERVICES,

      Defendants.

---

**OPINION AND ORDER**

---

On January 19, 2015, plaintiff T.D. ("T.D." or "plaintiff") filed a Second Amended

Complaint against Kelcey Patton ("Patton") and The Denver Department of Human Services ("the

DDHS"). (ECF No. 94).[1]  Therein, plaintiff raised a claim pursuant to 42 U.S.C. § 1983 ("§ 1983")

for injuries he allegedly suffered after being placed with his father ("Father").  (ECF No. 94 at

¶¶ 55-83.)  Plaintiff premised his § 1983 claim under two separate theories of liability: (1) the

existence of a special relationship between plaintiff and Patton (*id*. at ¶ 58); and (2) Patton and the

DDHS' creation of a danger (*id*. at ¶¶ 59, 72).  Plaintiff sought solely monetary damages.  (*Id*. at 9.)

Pending before the Court is plaintiff's motion for partial summary judgment against Patton

as to the special-relationship theory of liability ("plaintiff's motion for summary judgment") (ECF

---

[1] T.D.'s mother, Regina Garcia, was named as a plaintiff in the Original Complaint (ECF No. 4)
and the First Amended Complaint (ECF No. 84), but was omitted as a plaintiff in the Second Amended
Complaint.

No. 131) and statement of undisputed material facts (ECF No. 131-1).  Defendant filed a response

to plaintiff's motion for summary judgment (ECF No. 179), a response to plaintiff's statement of

undisputed material facts (ECF No. 180), and an affidavit ("affidavit") (ECF No. 180-2).  Plaintiff

then filed a reply (ECF No. 202) and a reply statement of undisputed material facts ("plaintiff's

RSUMF") (ECF No. 203).

Patton subsequently filed her own motion for summary judgment as to both alleged theories

of liability under § 1983 ("Patton's motion for summary judgment") (ECF No. 144) and statement

of undisputed material facts (ECF No. 145).  Plaintiff filed a response in opposition to the motion

for summary judgment (ECF No. 181) and a response to defendant's statement of undisputed

material facts (ECF No. 182).  Defendant then filed a reply (ECF No. 204) and a reply statement of

undisputed material facts ("Patton's RSUMF") (ECF No. 205).[2]

For the reasons discussed herein, plaintiff's motion for summary judgment is DENIED, and

Patton's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.    Factual Background

The following uncontested and properly supported facts are taken from plaintiff's RSUMF

(ECF No. 203) and Patton's RSUMF (ECF No. 205), both of which, consistent with this Court's

Civil Practice Standards, contain plaintiff's or Patton's initial statement of uncontested material

facts, plaintiff's or Patton's response statement of uncontested material facts, and plaintiff's or

Patton's reply statement.[3]

_____

[2] The DDHS has also filed a motion for summary judgment (ECF No. 135), which has been fully
briefed (ECF Nos. 183, 201).  The Court will dispose of that motion in a separate opinion.

[3] Patton accurately asserts that, in plaintiff's response statement of material facts (ECF No. 182),
plaintiff violated this Court's Civil Practice Standards in submitting more than 40 additional facts without
prior leave.  (*See* ECF No. 205 at 28 n.1); *see also* Civil Practice Standard IV.B.2.b.ii.  However, because

On November 2, 2009, the DDHS received a report from T.D.'s therapist at the Mental Health Center day treatment program stating T.D. had not been in school since October 15, 2009, his medications had not been refilled, and he had not participated in therapy.  (ECF No. 205 at ¶ 1.) T.D. was in a diversion program for criminal charges and his diversion counselor was requesting probation.  Both the counselor and the therapist had called plaintiff's mother, Regina Garcia ("Garcia"), but she responded only once, stating she was in a different town and would bring T.D. back to school, but she didn't.  After Garcia returned, the case worker went to Garcia's home and reported there were three dogs, a litter of puppies, and a cat in the home, animal feces and cigarette butts on the floor, dishes piled up in the sink, many piles of dirty clothes, and all the bedrooms and bathrooms appeared dirty.  The case worker provided Garcia with a list of tasks to accomplish, including getting T.D. back into the day program and re-filling his medications.  (*Id*.).  At this time, Garcia and Father had been referred to the DDHS for, respectively, intra-familial neglect and lack of supervision and intra-familial sexual abuse, both of which the DDHS had determined to be "[f]ounded."  (ECF No. 147-1 at 1-2.)

On April 9, 2010, the DDHS filed a Petition in Dependency or Neglect ("the Petition"), as to T.D. and his sister, M.D. ("M.D."), with the Juvenile Court for the City and County of Denver ("the Juvenile Court").  (ECF No. 147-2 at 1-2; ECF No. 203 at ¶ 3; ECF No. 205 at ¶ 5.)  The filing of the Petition was based on, *inter alia*, the following events.  On December 15, 2009, the DDHS received a referral that T.D. had been kicked out of treatment at the Mental Health Corporation of

---

virtually all of plaintiff's additional facts are merely a regurgitation of the facts submitted in connection with plaintiff's own motion for summary judgment, the Court has considered them in any event.  Thus, on this one occasion only the Court will excuse plaintiff's counsel's failure to to read the Court's publicly available Civil Practice Standards.

Denver due to noncompliance and truancy; specifically, bringing a knife to school and threatening to stab two boys.  (ECF No. 205 at ¶ 3.)  There was also concern that the boyfriend of T.D.'s oldest sister was involved in a gang, and the boyfriend had T.D. stealing and selling marijuana for him. T.D. was also on probation and had tested positive for "THC."  (*Id*.)  On January 4, 2010, the DDHS received a referral that T.D.'s violent behavior was increasing at home and school; specifically, T.D. had stabbed a sister in the elbow with a fork.  (*Id*. at ¶ 4.)  Garcia reported that T.D. had threatened to commit suicide on more than once occasion.  (*Id*. at ¶ 5.)  The family's in-home therapist reported T.D. was physically assaulting M.D.  Garcia had an IQ of 74, and was receiving services from "Denver Options."  The DDHS had concerns about Garcia's ability to care for her children.  (*Id*.) The Petition further noted that Father had engaged in a sexual offense against a minor; specifically, Garcia's oldest daughter P.G. ("P.G."), and referenced the criminal case number.  (*Id*. at ¶ 6.)

On May 12, 2010, a dispositional hearing was held with respect to the Petition.  (*Id*. at ¶ 7.) The DDHS' report for the hearing ("the Hearing Report") reflected, *inter alia*, the following.  T.D.'s family had a history of sexual abuse and multiple child protection referral inquiries.  T.D. needed mental health treatment and was beyond the control of Garcia.  Father sexually abused P.G., and was incarcerated for 2 years for sexual assault on a child.  Father was also a registered sex offender. Garcia took out a restraining order to keep Father away from her family.  T.D. had issues with anger and enuresis.  All of Garcia's children were on Individualized Education Programs.  Garcia's residence was disheveled and smelled of urine.  Garcia required assistance in disciplining her children, in making them follow house rules, and getting them to help with chores.  The family's risk assessment score was 11, indicating a high level of risk, and the children were determined to be unsafe.  (*Id*.)  The Hearing Report recommended that T.D.'s custody remain with the DDHS for

purposes of placement. (*Id.* at ¶ 9.) The Hearing Report was signed by Patton, a social caseworker, and her supervisor, Senait Ketema ("Ketema"). (ECF No. 147-3 at 16.) At all times relevant to this case, Patton was a caseworker for the DDHS. (ECF No. 203 at ¶ 2.)

At the May 12, 2010 hearing, the Juvenile Court ordered the DDHS to obtain a parental risk assessment of Father pursuant to the standards and guidelines of the Colorado Sex Offender Management Board ("SOMB"). (*Id.* at ¶ 24.) A parental risk assessment outlines concerns for safety and risk with respect to sex offenses. (ECF No. 131-13 at 31:11-18.)[4] Father's risk of reoffending was an important consideration. (ECF No. 131-10 at 50:25-51:2; ECF No. 203 at ¶ 26.)[5] The most important factor that a caseworker must consider when making a placement decision is the safety of the child. (ECF No. 203 at ¶ 31.) It was Patton's responsibility to arrange for the parental risk assessment of Father. (*Id.* at ¶ 27.)[6] Gomez was comfortable making recommendations about T.D.'s placement without a parental risk assessment because she "had people in the home" and "recommendations." (*Id.* at ¶ 73; ECF No. 180-3 at 105:12-106:4.) A parental risk assessment would have revealed that Father was a "high risk" with regard to all of his children, which means that he would not have been allowed contact with his children until he completed Section 5.7 of the SOMB Standards. (ECF No. 203 at ¶ 30; ECF No. 131-18.) On August 11, 2010, Cynthia Jamison ("Jamison"), Father's offense-specific treatment provider, reported that Father had met the requirement for completion of treatment under the SOMB Standards. (ECF No. 205 at ¶ 13.)

---

[4] Both parties assert the purpose of a parental risk assessment. (ECF No. 203 at ¶ 25.) Plaintiff's assertion misstates the cited testimony, while Patton's assertion is not supported by citation to any evidence.

[5] Although Patton responds to this factual assertion, her response does not dispute the deposition testimony to which plaintiff cites in support. (*See* ECF No. 203 at ¶ 26.)

[6] It is disputed whether Patton actually arranged for the assessment, and if she failed to, whether this violated the DDHS' policies. (*See* ECF No. 203 at ¶¶ 27, 29, 32.)

By May 25, 2010, the Juvenile Court had ordered, and T.D. had been placed, in a therapeutic residential child care facility called Shiloh House.  (ECF No. 203 at ¶¶ 5, 7; ECF No. 205 at ¶ 10.)  At Shiloh House T.D. resided, received treatment, and went to school.  (ECF No. 205 at ¶ 10.)  T.D. participated weekly in a family therapy session with Garcia, a family session with Father, an individual therapy session, and two group therapy sessions focusing on coping skills and anger management.  (*Id*.)

At a July 30, 2010 permanency planning hearing, it was reported that Father was participating in weekly family therapy with T.D., and the family therapist reported that they were making "great progress" and Father was "excellent support" to T.D.  (*Id*. at ¶ 11.)  The family therapist also noted that Father had requested T.D. return to Father's home once T.D. was discharged from Shiloh House.  (*Id*.)  After the July 20, 2010 permanency planning hearing, M.D. reported that she had been touched inappropriately by three different boys while living with Garcia.  (*Id*. at ¶ 12.)  M.D. was removed from Garcia's home and placed in foster care.  (*Id*.)

On August 17, 2010, a meeting was held at Shiloh House, and attended by T.D., Father, Patton, Briana Hutchinson ("Hutchinson"), an outside family therapist for T.D. and Father, and Kyle Hommes ("Hommes"), T.D.'s clinician.  (*Id*. at ¶ 14.)[7]  Jamison was not present at this meeting or

---

[7] In her statement of additional undisputed material facts, Patton asserts that the DDHS is not "solely responsible for a change in placement," and others are also responsible for assessing safety and risk in a placement, citing Gomez's deposition testimony.  (ECF No. 203 at ¶ 70.)  Gomez's testimony, however, is far from conclusive on these matters.  First, she testified initially that, in a change in placement, the DDHS "consults" with a guardian ad litem.  (ECF No. 180-3 at 85:11-17.)  Then, after being asked whether a guardian and clinicians are responsible for safety and risk assessments, she replied, "Yep."  (*Id*. at 85:20-24.)  No further questioning occurred on this issue, such as the specifics on what a guardian or clinicians would be responsible for in terms of safety and risk assessments.  Second, Gomez's testimony is thrown into doubt given that both clinicians on the Team testified that there role was to facilitate T.D.'s placement with Father because the placement decision had already been made.  (*See* ECF No. 180-6 at 73:14-23; ECF No. 180-1 at 67:2-13.)  As such, this fact is at best disputed.

at any other meeting.  (ECF No. 203 at ¶ 38.)[8]  At the meeting, the above individuals discussed a change of custody involving a transition of T.D. from Shiloh House to Father's house.  (*Id*.)  A "tentative plan" was made for the transition, subject to the approval of T.D.'s guardian ad litem, Lisa Gomez ("Gomez").  (*Id*.; ECF No. 147-7 at 5.)  The individuals agreed to start increased visits between T.D. and Father—visits that would be supervised by Father's wife, Nicole Duerson ("Nicole"), who had completed informed supervision classes.  (ECF No. 205 at ¶ 15.)  The individuals agreed that T.D. was no longer displaying behavior that justified placement in a therapeutic residential child care facility, and, since being removed from Garcia's home and placed in a structured environment, he had thrived.  (*Id*. at ¶ 16.)  The individuals further agreed that T.D. was ready to transition to a lower level of care.  (*Id*.)  Father told the meeting participants that he had completed his offense specific therapy and was no longer on probation.  (*Id*. at ¶ 15.)  A report to the Juvenile Court for a September 7, 2010 permanency planning hearing stated that, at the August 17, 2010 meeting, Hutchinson believed it to be in T.D.'s "best interest" to return to Father's home.[9]  (ECF No. 147-5 at 3.)

Prior to the August 17, 2010 meeting, Patton had reviewed Father's criminal history.  (ECF No. 203 at ¶ 9.)[10]  Father's criminal history reflected that, in April 2005, he was convicted of, and

---

[8] It is disputed whether Jamison *should* have been included in the team meetings.  (*See* ECF No. 203 at ¶ 39.)  While plaintiff cites to testimony from persons who state that, in their belief, Jamison should have been included, Patton cites her own deposition testimony in which she testified that Shiloh House invited people to the meetings.

[9] Plaintiff disputed Patton's citation to this report on the ground that Hutchinson testified during her deposition that it was not her job to say whether T.D. should be placed in Father's home.  (ECF No. 205 at ¶ 15.)  That may be the case, but it does not properly dispute the fact that, in the report for the September 7, 2010 hearing, the report stated that Hutchinson believed T.D.'s return to Father's home was in T.D.'s best interest.

[10] Plaintiff asserts that Patton misrepresented her knowledge of Father's criminal history, specifically, a conviction for the attempted sexual assault of a minor, to the individuals on the "Multi-

sentenced to two years' imprisonment for, one count of attempted sexual assault of a minor.  (ECF No. 131-11 at 3.)  Father's criminal history reflected that, in November 2007, he violated probation.  (*Id*.; ECF No. 203 at ¶ 16.)  Father's criminal history further reflected charges for a multitude of offenses, including, *inter alia*, misdemeanor assault, misdemeanor wrongs to minors, misdemeanor domestic violence, and misdemeanor resisting police authority.  (ECF No. 131-11 at 1-3.)[11]  The criminal history also stated, and Patton was aware, that Father was a registered sex offender.  (*Id*. at 1; ECF No. 203-1 at 10:2-4.)  Gomez reviewed the "[r]egistry of actions" related to Father's "criminal case," but she did not review the criminal case file.  (ECF No. 203 ¶ 69; ECF No. 180-3 at 79:6-25.)

With respect to Father's attempted sexual assault of a minor, the minor at issue was P.G., Father's step-daughter.  (ECF No. 203 at ¶ 12; ECF No. 131-17.)  A "Complaint — Revocation of Sex Offender Intensive Supervision Probation (SOISP)" ("the revocation complaint") stated the following about the offense.  P.G. was napping on a couch when Father climbed onto the couch, covered P.G. with a blanket, and pulled down P.G.'s panties.  (ECF No. 131-19 at 2.)  Father attempted to place his penis in P.G.'s anus, and Father used his hands to pull P.G. toward him while P.G. was trying to pull up her panties.  P.G. stated she felt Father's penis on her butt, but Father was unsuccessful with penetration due to P.G.'s mother, Garcia, entering the room.  (*Id*.)  In a document that the parties refer to as a "Trails report," it stated that P.G. told an interviewer that Father "tried

---

Disciplinary Team" involved in T.D.'s placement.  (*See* ECF No. 203 at ¶ 33.)  As discussed in more detail *infra*, this issue is dispute.

[11] Plaintiff asserts that Father's criminal history included multiple "charges and convictions" for these offenses.  (ECF No. 203 at ¶ 9.)  The Court has reviewed the document reflecting Father's criminal history, and the only offense that shows a conviction is the one for attempted sexual assault on a minor.  (*See* ECF No. 131-11 at 1-3.)  None of the remaining charges reflect a disposition other than Father being charged for the offense.

to 'put his dick in my butt.'"   (ECF No. 203 at ¶ 13; ECF No. 131-17.)   The Trails report also contained reports of multiple other incidents between P.G. and Father, in which Father dragged P.G. by her legs into a bedroom, and Father grabbed P.G.'s butt.   (ECF No. 131-17.)   Prior to T.D.'s placement in Father's home, Patton had reviewed the Trails report.   (ECF No. 203 at ¶ 14.)   Patton also knew that, in 2005, Father had violated a restraining order by attempting to contact P.G.   (*Id.* at ¶¶ 19-20.)

Patton was aware that Father's probation was revoked because he refused to comply with its terms.   (ECF No. 203 at ¶ 18; ECF No. 131-10 at 10:15-18.)   In the revocation complaint, a probation officer recommended revoking Father's probation because Father had "purposely failed to fulfill his treatment obligations at [Redirecting Sexual Aggression]," he had "been deceptive in disclosing his relationship with his current girlfriend," and he "purposely violated his no contact contract with his girlfriend, while missing treatment appointments at RSA." (ECF No. 131-19 at 2.) The probation officer noted that Father was "not amenable to treatment at this time due to his unwillingness to comply with all treatment and Probation conditions." (*Id.* at 2-3.) The probation officer stated that Father was arrested on November 13, 2007, after he indicated that he "wanted to 'go to jail.'" (*Id.* at 2.)   Father said that he wanted to go to jail because "'it is hard for me, the roadblocks, and being suicidal.'" (*Id.*)[12]

---

[12] Plaintiff asserts that Father told the probation officer that he would rather go to jail than complete sex offender treatment. (ECF No. 203 at ¶ 17.) However, the revocation complaint to which plaintiff cites does not support that assertion, nor does the testimony of Ketema. Thus, this alleged fact is not properly supported.

Prior to T.D.'s placement with Father, Patton's "gut [did not] feel good" about, and she questioned, placing T.D. with Father. (ECF No. 203 at ¶ 21; ECF No. 131-10 at 129:10-130:2.)[13] Patton's feeling in this regard was "[n]ot entirely" due to father's criminal history, and she wanted to make sure the team had thought of all possible options, including returning T.D. to Garcia's home. (ECF No. 180-4 at 130:17-131:6.)  In an initial draft of Patton's report to the Juvenile Court, she listed her concerns about placing T.D. with Father. (ECF No. 131-10 at 184:6-9.)  Those concerns were: Father's criminal record, specifically, Father's attempted sexual assault on P.G.; the revocation of Father's probation for noncompliance; and Jamison's concern that Father was "'not taking treatment seriously.'" (*Id*. at 186:9-187:21.)  These concerns were taken out of the report and not expressed to the Juvenile Court. (*Id*. at 175:9-176:18.)[14]  Patton did not place her concerns in the report because her supervisor, Ketema, told her "do not go against the DDHS," as the DDHS was going to return T.D. to Father. (*Id*. at 175:9-14, 176:12-18.)  Patton was also scared that if she expressed her concerns she might be fired. (*Id*. at 177:1-3; ECF No. 203 at ¶ 23.)[15]

Gomez, T.D.'s guardian ad litem, did not have any immediate concerns with Father re-offending because there were "eyes in the home," family therapy was being performed, Father had

---

[13] Plaintiff asserts that, prior to placement, Patton was concerned that T.D. would not be safe in Father's home, citing Patton's deposition testimony. (ECF No. 203 at ¶ 21.)  The portions of the transcript cited, however, do not support that assertion.  To the extent plaintiff contends that "'her gut did not feel good' was another way of saying [Patton] was concerned that T.D. would not be safe in father's home," this inference is for a jury, if any, to decide.

[14] It is disputed whether Patton told the members of the "Multi-Disciplinary Team" about her concerns with placing T.D. with Father. (*See* ECF No. 203 at ¶ 35.)  Although plaintiff cites testimony reflecting that Hutchinson does not recall being told about Jamison's concerns or the revocation of Father's probation, and that Gomez was not told about Jamison's concerns, Patton cites testimony from Hommes that there were "concerns" about Father's sex offense treatment.  At the very least, the evidence to which plaintiff cites does not support the contention that Patton did not tell the team about *any* of her concerns.

[15] Although Patton responds to this factual assertion, her response does not dispute the deposition testimony to which plaintiff cites in support. (*See* ECF No. 203 at ¶ 23.)

shown an "amazing" amount of interest in the case, Father was supportive, Garcia was going into the home and having dinner with the family, and no one expressed any concerns. (ECF No. 203 at ¶ 72.)  Gomez "likely" looked up Father's past criminal history on a state court database and was aware of the same.  (*Id*. at 203 at ¶ 75; ECF No. 180-3 at 127:25-128:6.)  Frequently, parents have extensive criminal histories in Gomez's cases, but this does not prevent children returning to the parents, as the criminal history is a risk factor to be mitigated.  (ECF No. 203 at ¶ 75; ECF No. 180-3 at 128:11-17.)

Generally, Gomez did not access Trails reports, but instead had conversations with a caseworker about the same.  (ECF No. 203-5 at 46:22-47:7.)  Gomez believed that Father's attempted sexual assault on P.G. involved "an inappropriate relationship between a stepfather and stepdaughter" in which P.G. did not resist Father's conduct.  (*Id*. at 43:10-44:2.)  Gomez had discussions with Patton and Garcia about Father's attempted sexual assault on P.G.  (*Id*. at 44:9-14.)  In Gomez's conversations with Patton about the offense, the information contained in the Trails report never came up.  (*Id*. at 45:9-47:11.)  If Gomez had been provided with the information from the Trails report about Father's attempted sexual assault on P.G. she "[p]robably" would not have recommended T.D.'s placement with Father "without further assessment."  (*Id*. at 45:9-46:17.)

On September 7, 2010, a permanency planning hearing was held before the Juvenile Court.  (ECF No. 205 at ¶ 19; ECF No. 147-10 at 1-2.)  At this hearing, by the agreement of Gomez and Patton, the Juvenile Court gave permission to transition T.D. to Father.  (ECF No. 205 at ¶ 19.)  Garcia and Garcia's attorney were also present at the hearing.  (*Id*.)  Because T.D. and Father were members of a Native American tribe, T.D.'s placement was subject to the Indian Child Welfare Act ("the ICWA").  (ECF No. 203 at ¶ 68.)  Under the ICWA, parties are required to make "active efforts" to reunify a family, rather than "reasonable efforts" under non-ICWA cases.  (*Id*.)  "Active

efforts" under the ICWA means that treatment plans must be written in a specific format in order to engage a family on issues of safety.  (*Id*.; ECF No. 203-3 at 55:14-25.)  If a parent is a high risk of sexually offending against a child, the ICWA does not require placement of that child with the parent.  (ECF No. 203-3 at 56:6-11.)

On September 17, 2010, a meeting was held at Shiloh House, and attended by T.D., Garcia, Hutchinson, Hommes, Nicole, Gomez, and Betty Virden ("Virden"), a representative for DDHS. (*Id*. at ¶ 20.)  Patton was not present at this meeting.  At the meeting, T.D.'s discharge plan was discussed, and supports were put in place to make his transition to Father's home smooth.  T.D. would begin with overnight passes on the weekend of September 24, 2010, followed by weekend long passes.  (*Id*.)

On October 8, 2010, another meeting was held at Shiloh House, and attended by T.D., Garcia, Hutchinson, Hommes, Father, Nicole, Gomez, and Virden.  (*Id*. at ¶ 21.)  Patton was not present at the meeting.  At the meeting, T.D.'s discharge plan was finalized.  (*Id*.)  As part of the discharge plan, T.D. would transition home with Father after school on October 15, 2010 and additional services would be provided through the "Griffith Center" to help support the transition. (*Id*.; ECF No. 147-12 at 5.)  In a report on the October 8, 2010 meeting, Gomez and Garcia, among others, checked a box acknowledging their agreement with the plan discussed in the meeting and signed the report.  (ECF No. 147-12 at 6.)[16]

---

[16] Plaintiff disputes this fact on the ground that, in her deposition testimony, Garcia testified that she did not agree with T.D. being placed with Father.  (ECF No. 205 at ¶ 21.)  First, the cited portions of Garcia's deposition testimony do not support plaintiff's dispute.  The first portion relates to pages 93 and 94 of the transcript, however, page 94 was not provided in plaintiff's exhibit.  (*See* ECF No. 182-3 at 3-4.) The second portion relates to Garcia not giving her attorney authorization to agree to placement and custody, which is not the issue raised in this factual statement.  (*See id*. at 101:3-12.)  The third portion relates to Garcia telling her family therapist "about [Father]," which is not the issue here and the testimony does not set forth what Garcia told her family therapist about Father.  In any event, Garcia's testimony

In a "Stipulated Agreement Re: Change of Placement and Custody" ("the Stipulated Agreement"), it was noted that T.D. had "successfully transitioned" to Father's home on October 15, 2010. (ECF No. 205 at ¶ 22; ECF No. 147-9 at ¶ 5.)  Gomez filed the Stipulated Agreement with the Juvenile Court on October 21, 2010. (ECF No. 205 at ¶ 23.)  The Stipulated Agreement moved the Juvenile Court to allow a change in placement and "temporary legal custody" with respect to T.D. from the DDHS to Father. (ECF No. 147-9 at 1, ¶ 8.)  The Stipulated Agreement stated that temporary legal custody should be returned to Father so that T.D. could enroll in school and so T.D. could be added to Father's public assistance benefits. (*Id*. at ¶ 6.)  The Stipulated Agreement further stated that Gomez had contacted Patton, Garcia, Garcia's attorney, Carolyn Pelloux, about T.D.'s change in placement, and they all agreed with the same. (*Id*. at ¶ 7; ECF No. 203 at ¶ 76.)[17]  In an "Order" dated November 3, 2010, the Juvenile Court granted "temporary legal and physical custody" to Father "under an order of supervision by [the DDHS]." (ECF No. 205 at ¶ 24; ECF No. 147-9 at 4.)[18]

---

certainly does not dispute the fact that she checked the "Agree" box on the report and signed it.  Thus, this fact is not properly disputed.

[17] Plaintiff again objects to the fact that Garcia agreed to T.D.'s placement with Father based on the same testimony discussed in footnote 16. (ECF No. 205 at ¶ 23.)  For similar reasons to the ones discussed *supra*, however, that testimony does not properly dispute the clear fact that Gomez stated in the Stipulated Agreement that Garcia agreed with the placement.

[18] Patton asserts that the Juvenile Court's Order was entered on October 22, 2010, citing a printed copy of the Juvenile Court's docket. (ECF No. 205 at ¶ 24.)  Patton's citation is accurate (*see* ECF No. 147-10 at 1), however, the copy of the actual Order clearly shows that it was dated on November 3, 2010 (*see* ECF No. 147-9 at 4).  Given this discrepancy, the Court is more persuaded to accept the copy of the actual Order, for purposes of the date that it was entered, rather than a printout of the Juvenile Court's docket.  On an unrelated front, plaintiff appears to dispute the legal impact of the Juvenile Court's Order with respect to whom had custody of T.D. following entry of the Order. (*See, e.g.*, ECF No. 205 at ¶ 24.)  However, the legal impact of the Order is not a factual issue.  Moreover, the language of the Order is clearly set forth in the exhibit, and plaintiff has not properly disputed the language used.

At the time of T.D.'s placement with Father, T.D. suffered from bipolar and had a "borderline" IQ.  (ECF No. 203 at ¶¶ 49-50.)  Patton completed a verbal safety plan that she discussed with the Multi-Disciplinary Team ("the Team"), Father, and Nicole.  (ECF No. 205 at ¶ 25; ECF No. 144-1 at 116:16-117:15.) Patton believed that Hutchinson would be in Father's home twice a week monitoring the placement.  (ECF No. 205 at ¶ 26.)[19]  T.D. continued to attend the Shiloh Home day treatment program and the Team anticipated transitioning him to local home school within the next trimester.  (*Id.* at ¶ 27.)  Since being placed in Father's home, T.D. had continued to make persistent progress in his treatment and had earned regular passes with Garcia. (*Id.*)

A report to the Juvenile Court for a December 13, 2010 review hearing stated that Father had been successfully discharged from probation, was compliant with the DDHS' treatment plan, and was maintaining contact with T.D.'s case worker.  (*Id.* at ¶ 17.)  After a permanency planning hearing in December 2010, Father and T.D. were successfully discharged from Griffith Center family therapy.  (*Id.* at ¶ 28.)  The family therapist reported the family reached all of their treatment goals and she had no safety concerns regarding Father's house.  (*Id.*)  T.D. had made improvements in his behavior and transitioned from Shiloh Home day treatment to Everitt Middle School.  (*Id.* at ¶ 29.) T.D. was no longer acting out in a physically aggressive manner, and was following household rules. Overall, it appeared T.D. was flourishing in Father's house.  Patton expressed one concern with T.D. missing 30 class periods in the second school term, and encouraged the family to schedule appointments during school breaks to minimize missed school days.  (*Id.*)

---

[19] It is disputed whether Patton failed to observe Father's home "at least every other month," and whether the efforts Patton made to do so violated the DDHS' policies.  (*See* ECF No. 203 at ¶ 51.)

14

In a report prepared for a June 13, 2011 permanency planning hearing, Patton stated that, at the last hearing on March 21, 2011, it was reported that Father had used physical punishment on T.D. (*Id*. at ¶ 30; ECF No. 147-14 at 4.)  Patton and Gomez met with T.D. outside the presence of his parents, and T.D. reported that Father had hit him with a wooden handle mop across his back because he did not complete his chores. (ECF No. 205 at ¶ 30.)  To assist Father in developing his parenting skills, Patton gave Father a referral to participate in the DDHS' Fatherhood Initiative Program. (*Id*.)  Patton further reported that T.D. was staying with Garcia on weekends, and, after the March 2011 hearing, Garcia had reported to Patton that T.D. was disrespectful and refused to complete chores, and often smelled bad and had unclean clothes when he arrived at her home. (*Id*. at ¶ 32.)  Patton was also contacted by school officials who reported that in the last few months of school T.D. spent a large amount of time at the nurse's office complaining of sickness and body aches, and appeared to be fearful of Father and at times did not want to go home. (*Id*.)

Upon hearing of these issues, Patton wanted to remove T.D. from Father's home because she was afraid for T.D.'s safety. (ECF No. 131-10 at 197:14-199:15.)  Ketema instructed Patton to hold a face-to-face meeting with T.D., but stated that T.D. would remain in Father's home. (*Id*. at 198:19-199:10.)  Patton understood that she would be terminated if she did not follow those instructions. (*Id*. at 199:19-24.)  In the June 13, 2011 permanency planning hearing report, Patton stated that she wanted to maintain T.D. in Father's home and that, although she had some concerns with Father's parenting skills, she wanted to preserve the family unit. (ECF No. 205 at ¶ 30; ECF No. 147-14 at 4.)[20]  At the June 13, 2011 permanency planning hearing, the Juvenile Court ordered that Father was

---

[20] Patton asserts that she and Gomez felt comfortable with keeping T.D. in Father's home. (ECF No. 203 at ¶ 53.)  However, other than her affidavit, the evidence she cites reflects only that Patton—"this worker"—wanted to keep T.D. in Father's home. (*See* ECF No. 131-32 at 4.)  The Court will not allow Patton to re-write her in-the-moment report with her post-deposition affidavit. *See Murray v. City of*

not to use physical discipline on T.D., and that Father participate in the "Fatherhood Initiative" or a comparable program.  (ECF No. 205 at ¶ 33.)

In a report prepared for an August 25, 2011 permanency planning hearing, Patton reported that she was having difficulty contacting Father and was unable to complete her face to face contact with T.D. for the month of July.  (*Id.* at ¶ 34; ECF No. 147-16 at 3.)  Patton was able to follow up with Father regarding his agreement to attend fatherhood classes, and he claimed he attended one class but couldn't name the organization.  (ECF No. 205 at ¶ 34; ECF No. 147-16 at 3.)  Patton then made another referral to attend the DDHS' fatherhood classes, and followed up with the class coordinator.  (ECF No. 205 at ¶ 34; ECF No. 147-16 at 3.)  The coordinator confirmed Father had attended the class and actively participated, but expressed concern with his level of commitment due to his inquiry regarding how long he would have to attend.  (ECF No. 205 at ¶ 34; ECF No. 147-16 at 3.)  Patton confirmed completing the program was part of Father's treatment plan and requested an order requiring Father to complete the program.  (ECF No. 205 at ¶ 34; ECF No. 147-16 at 3.)  Patton also reported she had tried several times without success to obtain a written parental assessment, but confirmed Father actively participated in family therapy and appeared to be appropriate with younger children.  (ECF No. 205 at ¶ 34; ECF No. 147-16 at 3.)

On September 19, 2011, the DDHS received a report from an unnamed "[r]eporting party," reporting allegations of sexual contact between T.D. and his half-brother.  (ECF No. 205 at ¶ 35; ECF No. 147-17 at 8.)  On September 21, 2011, the DDHS removed T.D. from Father's home.  (ECF No. 203 at ¶ 66.)  On September 22, 2011, the DDHS filed a motion to take T.D. into temporary custody, and the motion was granted on the same day.  (ECF No. 205 at ¶ 36.)  T.D. was then placed

---

*Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (explaining that self-serving affidavits are not sufficient to defeat summary judgment).

at the "Family Crisis Center" on an emergency basis.  (*Id.* at ¶ 37.)  On September 26, 2011, a

hearing was held for the re-placement of T.D.  (ECF No. 205 at ¶ 39.)  At this hearing, it was

reported that T.D. was "on the run" from the Family Crisis Center.  (*Id.*)

In a report prepared for a November 16, 2011 permanency planning hearing, Patton reported

that she had, had minimal contact with Father since the previous court hearing, and Father's youngest

children were removed from his home due to domestic violence and drug use in the home.  (*Id.* at

¶ 40.; ECF No. 147-19 at 3.)  The DDHS and Gomez agreed that removal of T.D. from Father's

home was warranted due to reports of T.D. being physically punished.  (ECF No. 205 at ¶ 40; ECF

No. 147-19 at 3.)  Patton also reported that Father attended only one fatherhood program class,

Father had moved out of state and was not in compliance with his treatment plan, and the DDHS did

not agree to Father having any contact with T.D.  (*Id.* at ¶ 41; ECF No. 147-19 at 4.)  At the

November 16, 2011 hearing, the Juvenile Court noted that T.D. was at the Family Crisis Center and

doing better.  (ECF No. 205 at ¶ 42.)  The Juvenile Court prohibited contact between Father and T.D.

(*Id.*)

In March 2014, T.D. reported that Father had sexually assaulted him while he was in Father's

care.  (ECF No. 203 at ¶ 57; ECF No. 205 at ¶ 43.)  The DDHS conducted an investigation into these

allegations.  (ECF No. 203 at ¶ 58.)  The DDHS' investigation made the following conclusions.[21]

In August 2011, Father repeatedly sexually assaulted T.D. by forcibly orally sodimizing him on two

occasions, and by forcing him and his three-year-old brother to perform sex acts on each other.  (*Id.*

at ¶ 59.)  Father hit T.D. with a broomstick, and threatened to knock T.D. unconscious and send him

---

[21] In response to plaintiff's factual assertions regarding the DDHS' investigatory conclusions, Patton merely states that the conclusions are reflected in ECF No. 131-33.  That does not specifically dispute the factual assertions stated in plaintiff's statement of uncontested material facts, thus, the Court deems those statements as undisputed.  *See* Civil Practice Standard IV(B)(2)(b)(ii).

to hospital if he did not perform oral sex on Father. (*Id.* at ¶ 60.)  Father forced T.D. to perform oral

sex on Father for 10 to 15 minutes as punishment for T.D. staying up past his bedtime. (*Id.* at ¶ 62.)

Father physically forced T.D. and his younger brother to perform oral sex on each other. (*Id.* at

¶ 63.)  Father told T.D. not to tell anyone about the abuse because, if he did, Father would go to jail

and never talk to T.D. again. (*Id.* at ¶ 64.)  The DDHS concluded that the abuse T.D. suffered was

"severe." (*Id.* at ¶ 65; ECF No. 131-31 at 70:4-23; ECF No. 131-35.)

## II.    Legal Standard for Summary Judgment

Summary judgment is appropriate "when there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Initially, the

movant bears the "responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If this

burden is met, then the non-moving party must set forth specific facts showing that there is a genuine

dispute for trial. *Id.* at 324.  A fact is material if it has the potential to affect the outcome of a dispute

under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  An issue is genuine

if a rational trier of fact could find for the non-moving party. *Adams v. Am. Guarantee & Liab. Ins.

Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are

construed in the light most favorable to the non-moving party. *Id.*  However, a mere "scintilla of

evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563

F.3d 1136, 1142 (10th Cir. 2009).  Instead, a non-movant "must proffer facts such that a reasonable

jury could find in her favor." *Id.*

### III. Qualified Immunity

As discussed *infra*, Patton raises a qualified immunity defense to both theories of liability under § 1983.  When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a "heavy two-part burden."  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation omitted).  First, the plaintiff must establish that the defendant's actions violated a constitutional or statutory right.  If the plaintiff succeeds in this endeavor, he must then establish that "the right at issue was clearly established at the time of the defendant's unlawful conduct."  *Id*.  In determining whether a right is "clearly established," a court "assesses the objective reasonableness of the action at the time of the alleged violation and asks whether the right was sufficiently clear that a reasonable officer would understand that what [she] is doing violates that right."  *Id*. (quotation and alteration omitted).  In other words, "the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law."  *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998).  Preexisting law refers to a "Supreme Court or Tenth Circuit opinion on point," however, a factually identical case is not required, as "some degree of generality in factual correspondence" is allowed.  *Id*.

### IV. Discussion

Generally speaking, state officials are not liable under the Due Process Clause for violence committed by third parties.  *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011).  There are, however, two exceptions to this general rule: when (1) "the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual," *id*., also known as a "special

relationship"; and (2) the state "created the danger that harmed the individual," *Armijo*, 159 F.3d at 1260 (quotation omitted), also known as "danger creation."

Plaintiff moves for partial summary judgment against Patton as to the special-relationship theory of liability. (ECF No. 131.) Plaintiff argues that he was in the DDHS' "legal" custody from September 2010 to November 2011, Patton knew that placement with Father was dangerous or she failed to exercise professional judgment in that regard, there was an affirmative link between Father's danger and T.D.'s injuries, and Patton's conduct was conscience shocking. (*Id*. at 4-11.) Plaintiff also argues that Patton is not entitled to qualified immunity. (*Id*. at 12-17.)

In return, Patton moves for summary judgment as to both alleged theories of liability under § 1983. (ECF No. 144.) As to the special-relationship theory, Patton argues that it fails because T.D. was not in state custody when the alleged injurious conduct took place, and, in any event, he is entitled to qualified immunity on that issue. (*Id*. at 1, 5-6.) With respect to the danger-creation theory of liability, Patton argues that he is entitled to qualified immunity because, even if her conduct violated T.D.'s constitutional rights, those rights were not clearly established at the time of the alleged violations. (*Id*. at 7 n.3, 8, 16-20.)

## A. Special Relationship

As previously explained, a special relationship is created when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection. *J.W.*, 647 F.3d at 1011. This includes when a state places a child in foster care. *Id*. However, a defendant only violates this duty if: (1) she knew of the danger to the individual or failed to exercise professional judgment in that regard; and (2) an affirmative link can be shown to the injuries suffered. *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012). "Whether the state official failed to exercise professional

judgment requires more than mere negligence; the official must have abdicated her professional duty sufficient to shock the conscience." *Id*. at 585-586.

The parties' motions for summary judgment cross horns on the special-relationship theory; specifically, as to whether T.D. was in the custody of the DDHS, and, if so, when. In his motion for summary judgment, plaintiff asserts that he was in the custody of the DDHS from September 2010 to November 2011, citing his statement of undisputed facts, which, in turn, relies on an admission made during discovery by Patton and the DDHS. (ECF No. 131 at 5; ECF No. 203 at ¶ 4.) However, on July 9, 2015, the Court granted Patton and the DDHS' joint motion to withdraw that admission—a motion that plaintiff did not oppose. (*See* ECF No. 194.) Thus, that admission cannot support the argument made in plaintiff's motion for summary judgment.

Perhaps realizing this, plaintiff changes tack in his reply, arguing now that "T.D.'s custodial status at the time of the assault is insignificant." (ECF No. 202 at 6 n.1.) Plaintiff argues that "[t]he proper analysis focuses [ ] on the custodial relationship at the time of the defendant's conduct." (*Id*. at 6.) Plaintiff, thus, asserts that he was in the DDHS' custody for purposes of his § 1983 claim because, when Patton "facilitated [T.D.'s] placement in a home that she knew or suspected was dangerous," he was in the DDHS' custody. *Id*. at 8-9.

In response to plaintiff's motion for summary judgment, and in her own motion for summary judgment, Patton argues otherwise. Specifically, she argues that custody for purposes of this claim should be measured from the time that the "acts of private violence allegedly occurred." (ECF No. 144 at 5-6; ECF No. 179 at 3-5.) Patton argues that, as a result, T.D. was not in the DDHS' custody for purposes of § 1983 liability because legal custody transferred to Father by at least November 2010, and Father's alleged assault of T.D. took place after this date. (ECF No. 179 at 4-5.) In

21

response to Patton's motion for summary judgment, as well as reiterating his arguments about when the custodial relationship should be assessed, plaintiff also retorts that Father was only awarded "temporary legal custody of T.D." for the purposes of enrolling T.D. in school and adding T.D. to father's public assistance benefits. (ECF No. 181 at 14.)

The Tenth Circuit Court of Appeals has recently explained the scope of the special-relationship theory. In *Schwartz*, the Tenth Circuit explained that the theory originated from the Supreme Court's decision in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998 (1989), where the Supreme Court held that, "'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" *Schwartz*, 702 F.3d at 580 (quoting *DeShaney*, 489 U.S. at 199-200). The *DeShaney* Court further clarified that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *DeShaney*, 489 U.S. at 200. Once a special relationship is formed, the Tenth Circuit explained in *Schwartz* that it triggers "a continuing duty" that is violated when a state official knows of a danger or fails to exercise professional judgment with respect thereto, and there is an affirmative link to the injuries suffered. *Schwartz*, 702 F.3d at 580. Importantly, the Tenth Circuit explained that "the scope of this relationship has turned on the dependent and involuntary nature of the custodial relationship between the individual and the State. *Id*.

Here, although plaintiff alleges that the order awarding Father temporary legal custody was "ambigu[ous]"—on the ground that there is no evidence explaining "the temporary nature" of the

custody (ECF No. 181 at 14)—there is effectively no dispute that T.D. was not in the DDHS' custody at the time that the alleged injuries occurred in this case.  First, the Court can discern no ambiguity from the Juvenile Court's November 3, 2010 order transferring temporary legal and physical custody to Father.  The order stated that "temporary legal and physical custody is returned to [Father] under an order of supervision by the [DDHS]."  (ECF No. 147-9 at 4.)  The language of the order has clear meaning, and plaintiff provides no explanation of how the word "temporary" adds any ambiguity to that meaning.  (*See* ECF No. 181 at 14.)  To the extent plaintiff is arguing that the length or term of Father's legal and physical custody of T.D. is ambiguous, that may be the case, but that does not make the fact that Father was granted legal and physical custody ambiguous, even if such grant was on a temporary basis.

To the extent that any further clarification is needed, plaintiff's own argument belies his conclusion.  Plaintiff asserts that Father was granted temporary custody "so that [T.D.] could enroll in school and be added to Father's public assistance benefits."  (ECF No. 181 at 14.)  As Patton argues, "[i]f Plaintiff's basic human needs were being provided through Father's benefits, they were not being provided by the [DDHS]."  (ECF No. 204 at 5.)  Simply put, one of the purposes of granting Father custody of T.D. was so that Father would be able to obtain benefits that would allow him to provide for T.D.'s basic human needs.  As a result, when legal and physical custody was transferred to Father on November 3, 2010, a special relationship no longer existed between T.D. and the DDHS.  *See DeShaney*, 489 U.S. at 200.

That leaves plaintiff's principal argument: that T.D.'s custodial status at the time of Father's alleged assault is insignificant because the proper focus is on the custodial relationship at the time of Patton's conduct.  (ECF No. 202 at 6-8 & n.1.)  Patton counters that plaintiff's position is

23

"fundamentally inconsistent" with the basic premise of the special-relationship theory being involuntary restraint that triggers an affirmative duty to protect. (ECF No. 204 at 6.) Patton asserts that the theory has never been applied to a child that was once in state custody, but was later returned to the custody of one of his parents. (*Id*. at 7.)

The Court finds helpful in this regard the Tenth Circuit's discussion of the special-relationship theory and the scope of the affirmative duty to protect in *Armijo*. In that case, the Tenth Circuit explained that, if a state restrains an individual's freedom to protect himself, "the state may thereby enter into a 'special relationship' *during such restraint* to protect that individual from violent acts inflicted by others." *Armijo*, 159 F.3d at 1261 (emphasis added). Applying this concept to the facts in that case, the Tenth Circuit explained that the facts showed that the plaintiff was a public school student confined in a school counselor's car during a drive home from school. *Id*. The Tenth Circuit stated that, even if those circumstances constituted a custodial relationship, that relationship ended once the plaintiff exited the car and ran to his house "because *at that point he was no longer under any involuntary restraint by a school official*." *Id*. (emphasis added.). The Tenth Circuit further stated that the only restraint imposed on the plaintiff was the principal's directive that he could not return to school, which "[did] not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." *Id*. The Tenth Circuit also noted that the defendants' knowledge of a risk of harm to the plaintiff was "not relevant to the determination of whether a special relationship existed." *Id*. at 1262 n.5.

Although not precisely on point to the facts of this case, the Court finds the reasoning and conclusion in *Armijo* to be persuasive as to the resolution of the parties' battle here. Notably, the reasoning in *Armijo* makes it evident that the focus of the special-relationship theory is the level of

restraint imposed on an individual *at the time of that individual's injury*.  *See id.* at 1261-62 ("The fact that Armijo ended his life *after* he was 'released' [ ] bars any liability under the special relationship doctrine.") (emphasis in original); *see also J.W.*, 647 F.3d at 1011 (explaining that the state owed children "the affirmative duty of protection *while they were in foster care*.") (emphasis added).

In *Armijo*, when the plaintiff's injuries occurred, the only restraint imposed was that he not return to school.  159 F.3d at 1261.  The Tenth Circuit concluded that this was insufficiently restrictive to constitute involuntary restraint.  *Id.*  Here, at the time of T.D.'s alleged injuries, neither the DDHS nor Patton had imposed any restraint upon T.D.  Even construing the facts in a light incredibly favorably to plaintiff, the only possible restraint that the DDHS and/or Patton could conceivably be charged with is facilitating or recommending T.D.'s placement with Father.  However, plaintiff cites no support that would equate placing a child with his natural father as a "restraint" on the child, and certainly not a restraint that rises "to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual."  *See id.*  The fact that Father allegedly exercised his parental control in cruel and injurious ways does not transform the nature of the DDHS' or Patton's relationship, or lack thereof, with T.D. at the time of his alleged injuries.  Moreover, as the Tenth Circuit explained in *Armijo*, this result does not change even if Patton was aware of a risk of harm to T.D., as there was no present custodial relationship at the time of T.D.'s alleged injuries.  *See id.* at 1262 n.5.

In his reply in support of his motion for summary judgment, plaintiff states that the "most analogous" case on this issue is *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133 (10th Cir. 2006).  (ECF No. 202 at 7-8.)  *Johnson* involved a child with severe spina bifida being placed with

an adoptive parent. *Johnson*, 455 F.3d at 1135-38.  Although there was some hesitation and doubt about the adoptive parent, a government department allowed preadoptive placement.  During the preadoptive placement, a nurse noticed swelling, bruises on the child's face and right hand, and marks on the child's body.  *Id*. at 1136-37.  After a delayed home visit, a state official determined there was no evidence of physical abuse.  *Id*. at 1137.  During the same period, the adoptive parent's father moved into the home, and the adoptive parent removed the child from daycare and fired the home health nurses.  *Id*. at 1137-38.  In addition, the social worker primarily assigned to the child did not visit her for a two-month period.  *Id*. at 1138.  The child's adoption was finalized after these events.  The abuse allegations and the state official's report with respect to the same were provided to the children's court and guardian ad litem prior to the final adoption.  A month after the adoption, the child was brought to an emergency room and subsequently died.  Hospital personnel determined that her death was due to child abuse.  *Id*.

The child's personal representative filed suit against, *inter alia*, a social worker, Virginia Villareal ("Villareal"), who had initially been the supervisor of the child's primary case worker and then, for a two-month period, became the child's primary case worker.  *Id*. at 1136-38.  Pertinent to this case, the personal representative brought a claim under § 1983 against Villareal premised on the special-relationship theory.  *Id*. at 1144.  The personal representative alleged, *inter alia*, that Villareal failed to exercise professional judgment in placing the child in the adoptive parent's home, and in failing to investigate the arrival of the adoptive parent's father and the decisions to withdraw the child from daycare and fire the home health nurses.  *Id*.  Villareal conceded that the state had a special relationship with the child, but argued that her conduct did not violate the Fourteenth Amendment.  *Id* at 1143.

With respect to the allegation regarding the child's placement in the adoptive parent's home, the Tenth Circuit noted that Villareal did not make the placement on her own, given that she acted on the advice of an adoption consultant and as part of the government department's committee, and only two department employees expressed any doubts about the placement, both of which the Tenth Circuit considered "mild doubts." *Id*. at 1144. As a result, Villareal did not fail to exercise professional judgment in that regard. *Id*. The Tenth Circuit, however, concluded that there were disputed questions of fact as to Villareal's professional judgment in failing to investigate the arrival of the adoptive parent's father and the removal of the child from daycare, and in failing to make any visits to the adoptive parent's house for a two-month period. *Id*. at 1145.

Plaintiff contends that, although the Tenth Circuit did not determine whether the special relationship between the child and the government department persisted after the adoption, because the Tenth Circuit "focus[ed] on the social worker's conduct during the time that the child was in state custody as opposed to conduct by the social worker or the mother following the adoption, the Tenth Circuit demonstrated that the appropriate special relationship analysis concentrates on the state actor's behavior during the period of state custody and not the custodial relationship at the time of third-party abuse." (ECF No. 202 at 8.) This, however, is a mischaracterization of the Tenth Circuit's analysis.

First, as plaintiff concedes, the Tenth Circuit's opinion contains no discussion of any type on the issue here: whether the state's special relationship with the child continued after a third party's adoption of the child. The simple reason for this is that Villareal conceded the issue, *Johnson*, 702 F.3d at 1143, that is clearly not the case here. Second, with respect to the focus of the Tenth Circuit's analysis, there is also a simple reason why it "focus[ed]" solely upon Villareal's pre-

27

adoption conduct: that was the only conduct that the personal representative alleged violated the Fourteenth Amendment. *See id*. at 1144. Notably, the Tenth Circuit's recitation of the factual background only contains facts as to Villareal's pre-adoption conduct. *Id*. at 1135-38. Thus, the Tenth Circuit had no facts or arguments before it related to "the social worker or the mother following the adoption." (*See* ECF No. 202 at 8.) In any event, it is axiomatic that the facts in *Johnson* would involve conduct that occurred *while* the child was in the custody of the defendants; otherwise, there would be no claim under § 1983 premised on the special-relationship theory. *See DeShaney*, 489 U.S. at 199-200. The actual issue here is whether such a custodial relationship continues for purposes of § 1983 liability after the relationship has ended by the transfer of legal and physical custody to a third-party. That is simply not addressed in *Johnson* due to the defendant's concession of the issue. Therefore, the Court does not find that case helpful or analogous.

Plaintiff also, briefly, cites to *DeShaney*, *Schwartz*, *Maldonado v. Josey*, 975 F.2d 727 (10th Cir. 1992), and *Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992). None of those cases are helpful to plaintiff however. In *DeShaney* and *Maldonado*, the courts concluded that a custodial relationship for § 1983 purposes did not exist. *DeShaney*, 489 U.S. at 201; *Maldonado*, 975 F.2d at 732-733. While in *Schwartz* and *Yvonne L.*, although a custodial relationship existed, this was because the children had been placed, and were injured or died, in foster care. *Schwartz*, 702 F.3d at 576-577, 580; *Yvonne L.*, 959 F.2d at 885, 892-93. That is not the situation here.

As a result, in light of Tenth Circuit case law indicating that the focus of the special-relationship theory is the level of restraint imposed on an individual at the time of that individual's injury, and plaintiff's failure to show that a custodial level of restraint existed at the time of his

injuries, plaintiff has failed to establish that Patton's actions violated a constitutional or statutory right. *See Armijo*, 159 F.3d at 1261. Thus, Patton is entitled to qualified immunity as to plaintiff's § 1983 claim premised on the special-relationship theory. *See Medina*, 252 F.3d at 1128. Moreover, even if plaintiff had established the first part of the qualified immunity analysis, because he has failed to provide a case that is remotely legally or factually analogous to the circumstances here, the second part of the analysis would have failed. *See id.*; *Armijo*, 159 F.3d at 1260.

Accordingly, plaintiff's motion for summary judgment is DENIED. Patton's motion for summary judgment is GRANTED with respect to the special-relationship theory of liability under § 1983.

### B.      Danger Creation

### 1.      Basic Principals

In this Circuit, there is a six-part test for determining whether a defendant created a danger for the purposes of § 1983 liability. Those parts are as follows: (1) the defendant created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a member of a limited and specifically definable group; (3) the defendant's conduct put the plaintiff at a substantial risk of serious, immediate, and proximate harm; (4) the risk of harm was obvious or known; (5) the defendant acted recklessly in conscious disregard of that risk; and (6) the defendant's conduct, when viewed in totality, is conscience shocking. *Armijo*, 159 F.3d at 1262-63. With respect to the first part, the Tenth Circuit has explained that, "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Id.*

at 1263.  Moreover, the analysis "focuses on the *affirmative actions* of the state in placing the plaintiff in harm's way."  *Currier v. Doran*, 242 F.3d 905, 919 (10th Cir. 2001) (emphasis added).

As an initial matter, in her motion for summary judgment, Patton moves for summary judgment as to the danger-creation theory based upon qualified immunity.  (ECF No. 144 at 1-2, 7-20.)  However, "[s]olely with respect to the danger creation theory, [Patton] moves for summary judgment on the second prong of the qualified immunity inquiry…."  (*Id*. at 7 n.3.)  In other words, Patton concedes, for purposes of her summary judgment motion only, that there are genuine issues of material fact as to whether plaintiff's constitutional rights were violated.  (*See id*.)  Patton, though, does not identify the genuine issues of material fact that exist.  (*See id*.)  Therefore, although not necessary for purposes of the first part of the qualified-immunity analysis, the Court must still identify Patton's conduct that arguably violated plaintiff's constitutional rights, otherwise there would be no way of determining whether "a reasonable officer would understand that what [Patton did] violate[d] that right."  *Medina*, 252 F.3d at 1128 (quotation omitted).  In doing so, the Court is required to construe genuine disputes of fact in favor of the nonmovant, plaintiff here.  *See Tolan v. Cotton*, 572 U.S. ___, 134 S.Ct. 1861, 1866 (2014).

## 2.    Pertinent Genuine Issues of Material Fact

Doing so, the properly supported facts show the following.  First, Patton was aware of Father's criminal history, including his conviction in April 2005 of attempted sexual assault of a minor.  (ECF No. 203 at ¶ 9; ECF No. 131-11 at 3.)  Patton was aware that this offense involved Father attempting "to put his dick in [P.G.'s] butt," and trying to pull P.G.'s panties down.  (ECF No. 203 at ¶ 14; ECF No. 131-17.)  Patton was also aware that Father had dragged P.G. by her legs into a bedroom, and Father had grabbed P.G.'s butt.  (ECF No. 203 at ¶ 14; ECF No. 131-17.)

Patton further knew that, in 2005, Father had violated a restraining order by attempting to contact P.G., and in November 2007, he violated his probation, with respect to his attempted-sexual-assault offense, for non-compliance. (ECF No. 203 at ¶¶ 16, 19-20.) Patton was also aware that Father was a registered sex offender, and that his criminal history reflected charges for a multitude of offenses, including, *inter alia*, misdemeanor assault, misdemeanor wrongs to minors, misdemeanor domestic violence, and misdemeanor resisting police authority. (ECF No. 203 at ¶ 9; ECF No. 203-1 at 10:2-4; ECF No. 131-11 at 1-3.)

The facts further show that the Juvenile Court was informed that Father had been convicted and sentenced for attempting to sexual assault P.G. (ECF No. 205 at ¶ 7.) However, Patton did not attach Father's criminal history record in her reports to the Juvenile Court, even though she initially planned to do so. (ECF No. 203 at ¶ 41). In that regard, although it is disputed, plaintiff's expert testified that Father's criminal history should have disqualified him from being a placement option. (ECF No. 131-16 at 92:5-21.)[22]

Next, the facts show that, prior to T.D.'s placement with Father, Patton's "gut [did not] feel good" about, and she questioned, placing T.D. with Father. (ECF No. 203 at ¶ 21; ECF No. 131-10 at 129:10-130:2.) In an initial draft of Patton's report to the Juvenile Court, she listed her concerns as: (1) Father's criminal record, specifically, Father's attempted sexual assault on P.G.; (2) the revocation of Father's probation for noncompliance; and (3) Jamison's concern that Father was "'not taking treatment seriously.'" (ECF No. 131-10 at 184:6-9, 186:9-187:21) These concerns were

---

[22] Patton objects to plaintiff's expert on the ground that plaintiff may not rely on an unverified expert report at summary judgment. (ECF No. 203 at ¶ 11.) That may be true, however, in this instance, plaintiff does not rely on his expert's report, rather plaintiff relies on the expert's deposition testimony, which is undisputedly an acceptable form of evidence to use at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A).

taken out of the report and not expressed to the Juvenile Court.  (*Id*. at 175:9-176:18.)  Patton did not place her concerns in the report because her supervisor, Ketema, told her "do not go against the DDHS," as the DDHS was going to return T.D. to Father.  (*Id*. at 175:9-14, 176:12-18.)  Patton was also scared that if she expressed her concerns she might be fired.  (*Id*. at 177:1-3; ECF No. 203 at ¶ 23.)

Gomez believed that Father's attempted sexual assault on P.G. involved "an inappropriate relationship between a stepfather and stepdaughter" in which P.G. did not resist Father's conduct. (ECF No. 203-5 at 43:10-44:2.)  Gomez had discussions with Patton and Garcia about Father's attempted sexual assault on P.G.  (*Id*. at 44:9-14.)  In Gomez's conversations with Patton about the offense, the information contained in the DDHS' Trails report never came up.  (*Id*. at 45:9-47:11.) If Gomez had been provided with the information from the Trails report about Father's attempted sexual assault on P.G. she "[p]robably" would not have recommended T.D.'s placement with Father "without further assessment."  (*Id*. at 45:9-46:17.)  Gomez was also not told about Jamison's concerns with Father.  (ECF No. 131-13 at 51:3-15.)

Although the extent is disputed, the facts also show that, with respect to the other members of the Team, Patton may have withheld some, if not all, of her concerns regarding T.D.'s placement with Father.  First, Hutchinson could not recall being told about Jamison's concerns or the revocation of Father's probation.  (ECF No. 131-29 at 80:9-22, 81:1-14.)  Hutchinson testified that, if Patton had expressed her "concerns," she would "probably not" have endorsed T.D.'s placement with Father.  (*Id*. at 81:19-22.)  Hutchinson also testified that the decision to place T.D. with Father "had already been made or was in the process of being made" and she would not have been involved in the Team if there were concerns regarding Father.  (ECF No. 180-6 at 73:14-23.)  Second, Hommes

testified that there were conversations about "concerns" with Father.  (*See* ECF No. 180-1 at 65:16-24, 66:10-15, 18-25, 67:2-13, 19-25, 68:1.)  However, he also testified that he could not recall any of the conversations or remember if Patton had told him about any of her concerns.  (*Id.* at 65:16-17, 20-24, 66:14-15, 18-21, 67:3-5.)  Hommes further testified that T.D.'s placement with Father felt like "a decision [that] had been made, and it wasn't going to be reversed." (*Id.* at 67:5-13, 66:21-25.) Hommes' testimony also throws into doubt Patton's assertion that Father's criminal record was shared with the Team (*see* ECF No. 203 at ¶ 37), as Hommes testified that, if he had known about that record, he would not have endorsed T.D.'s placement with Father, (ECF No. 131-9 at 71:13-16).

After the Juvenile Court granted "temporary legal and physical custody" to Father on November 3, 2010 (ECF No. 147-9 at 4), the facts show the following.  At a March 21, 2011 hearing before the Juvenile Court, it was reported that Father had used physical punishment on T.D.  (ECF No. 205 at ¶ 30; ECF No. 147-14 at 4.)  After the hearing, Patton and Gomez met with T.D. outside the presence of his parents, and T.D. reported that Father had hit him with a wooden handle mop across his back.  (ECF No. 205 at ¶ 30.)  Patton then gave Father a referral to participate in the DDHS' Fatherhood Initiative Program.  (*Id.*)  Patton also became aware that T.D. was staying with Garcia on weekends, and Garcia had reported T.D. was disrespectful, refused to complete chores, often smelled bad, and had unclean clothes when he arrived at her home.  (*Id.* at ¶ 32.)  Patton was also contacted by school officials who reported that in the last few months of school T.D. spent a large amount of time at the nurse's office complaining of sickness and body aches, appeared to be fearful of Father, and at times did not want to go home.  (*Id.*)

Upon hearing of these issues, although Patton wanted to remove T.D. from Father's home because she was afraid for T.D.'s safety, Ketema instructed Patton that T.D. would remain in

Father's home, and Patton understood that she would be terminated if she did not follow those instructions. (ECF No. 131-10 at 197:14-199:15, 19-24.)  In the June 13, 2011 permanency planning hearing report, Patton informed the Juvenile Court of the above issues, but stated that she wanted to maintain T.D. in Father's home and that, although she had some concerns with Father's parenting skills, she wanted to preserve the family unit.  (ECF No. 205 at ¶ 30; ECF No. 147-14 at 4.)  At the June 13, 2011 permanency planning hearing, the Juvenile Court did not order T.D.'s removal from father's house.  (*See* ECF No. 205 at ¶ 33; ECF No. 147-15.)

On September 19, 2011, the DDHS received a report from an unnamed "[r]eporting party," concerning allegations of sexual contact between T.D. and his half-brother.  (ECF No. 205 at ¶ 35; ECF No. 147-17 at 8.)  On September 21, 2011, the DDHS removed T.D. from Father's home.  (ECF No. 203 at ¶ 66.)  After conducting an investigation in March 2014, the DDHS concluded that, *inter alia*, in August 2011, Father repeatedly sexually assaulted T.D. by forcibly orally sodimizing him on two occasions and by forcing him and his three-year-old brother to perform sex acts on each other.  (*Id*. at ¶¶ 57-59.)

### 3.   Analysis

As explained *supra*, the Court does not recount these facts in order to determine whether plaintiff has established genuine issues of material fact with respect to his danger-creation claim.  For purposes of summary judgment only, Patton has conceded that such genuine issues exist.  (*See* ECF No. 144 at 7 n.3.)  Moreover, because Patton failed to outline the specific genuine issues of material fact that exist, it was necessary for the Court to do so in Section B.2 *supra*.  The question now is whether the law was clearly established that Patton's conduct violated plaintiff's constitutional right.

The parties first appear to argue over the standard by which the Court is to gauge whether the law was clearly established.  (*See* ECF No. 181 at 4-6; ECF No. 204 at 9-10.)  Plaintiff asserts that the Court should inquire as to whether the constitutional right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  (ECF No. 181 at 5 (quotation omitted)).  Patton contends that the inquiry should ask "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted."  (ECF No. 204 at 10 (quotation, alteration, and emphasis omitted)).  The Court discerns little difference.  The constitutional right must be clear and, based upon the clarity of the right, it must be apparent or clear to the defendant that her conduct violated the right.  *Armijo*, 159 F.3d at 1260.  The real debates here are with the construction of the right and the application of the genuine issues of fact to that right.

Here, the constitutional right at issue is clear.  Specifically, case law in the Tenth Circuit has clearly established that state officials can violate a child's substantive due process rights if the official's reckless conduct created or increased a child's vulnerability to a danger that was known or obvious and the conduct was conscience-shocking.  *Currier*, 242 F.3d at 923-924; *Armijo*, 159 F.3d at 1262-63.  This right has been clearly established since 1993 or 1994.  *See Currier*, 242 F.3d at 924.  Thus, the only question is whether a reasonable official would have understood that Patton's conduct violated this right.  Because, at this juncture, all facts must be construed in a light most favorable to plaintiff, including all disputed facts, the Court finds that a reasonable official would have understood Patton's conduct to have violated plaintiff's right to be safe from a state-created danger.

The problem with Patton's analysis of this inquiry is that she fails to apply one of the fundamental concepts of summary judgment practice: that all facts must be construed in the light

most favorable to the non-movant. *See Tolan*, 134 S.Ct. at 1866. Specifically, in her motion for summary judgment, Patton presents a fact pattern that construes all of the material facts, and particularly the disputed material facts, in her own favor. In the motion for summary judgment, Patton contends that she was involved in a team decision-making process, T.D.'s placement was "collectively determined," and the Team made a recommendation to the Juvenile Court. (ECF No. 144 at 17.) Patton goes on that Father's attempted sexual assault on an "unrelated 15-year old female" did not provide notice that he would re-offend, the entire Team had "access" to the Trails system, and Garcia had personal knowledge of Father's offense. (*Id*. at 18.)

The facts, though, many of which are disputed, can just as easily be viewed in an entirely different light. To start with, the concept that a team decision-making process resulted in the recommendation to place T.D. with Father is severely undermined by Hommes' testimony that it felt like the decision had already been made by the time that the Team discussed concerns about Father and Patton's own testimony that Ketema told her that the DDHS was going to return T.D. to Father. In addition, Hutchinson testified that she did not have any role in the placement decision, and she would not have been on the Team if there were concerns regarding the placement. Next, a jury could quite easily believe that Father's prior sexual offense against P.G., his step-child, would have provided notice that he might re-offend against another child in his care, given the disputed issues over the revocation of Father's probation and his offense-specific treatment, and the multiple incidents of improper contact between Father and P.G. in the Trails report—the same concerns that Patton removed from her initial report. In any event, Patton has conceded that a risk of harm was known or obvious, as well as serious and immediate, by conceding the first part of the qualified-immunity analysis; another reason to construe facts in this regard in plaintiff's favor.

Ultimately, a critical piece of evidence is Patton's testimony that, although she had three concerns about T.D.'s placement with Father, she removed any mention of those concerns from the report submitted to the Juvenile Court because her supervisor warned her not to "go against" the DDHS and she feared being fired if she did express her concerns. (*See* ECF No. 131-10 at 175:9-14, 176:12-18, 177:1-3.) Based on this testimony, Patton failed to disclose important information to the Juvenile Court, not due to any professional reason, but due to fear for her own job security.  This is important because a reasonable jury could infer from the failure to disclose that Patton was aware of a risk to T.D., Patton intentionally and with disregard of that risk withdrew her concerns from the report, and the risk was substantial, serious, and immediate.  Put another way, why would Patton's supervisor and her supervisor's supervisor insist that the concerns be withdrawn from the report, other than they might result in T.D. not being placed with Father; a result contrary to that which the DDHS was trying to ensure?  Patton asserts that, based upon her testimony, she appears to have been a conduit for the DDHS' position (ECF No. 204 at 15), but the Court can discern no reason why that should scupper plaintiff's claim.  Patton was the person with the concerns and, despite T.D.'s safety being Patton's supposed paramount interest, it was her conduct, in removing her concerns, that placed T.D. at risk.

Patton's failure to disclose her concerns to the Juvenile Court also taints many of the other salient facts in this case.  Notably, it is very much disputed as to what amount of information was disclosed to the members of the Team.  Patton contends that the Team had "access" to the Trails system, however, this does not dispute Hommes' testimony that he did not know about Father's criminal record, Gomez's testimony that she did not generally access the Trails system, or Gomez, Hommes, or Hutchinson's testimony that at least some of Patton's concerns were not discussed with

them, and if they had been, there positions viz a viz T.D.'s placement could, probably, or would have been different.   Gomez is particularly important in this regard.   Patton focuses many of her arguments on the fact that the decision to place T.D. with Father was made subject to Gomez's approval and that, before the Juvenile Court, it was Gomez that requested T.D. be placed with Father.   (ECF No. 204 at 15-16.)   However, to the extent those facts are true, they are irrelevant if Gomez was making her approval and requests based upon incomplete information.   At her deposition, Gomez testified that, in her conversations with Patton, the information contained in the Trails report about Father's attempted sexual assault on P.G. never came up, and, if she had been provided with said information, she "[p]robably" would not have recommended T.D.'s placement with Father "without further assessment."   (ECF No. 203-5 at 5:9-7:11.)

Patton making an affirmative recommendation to the Juvenile Court *prior* to T.D.'s placement with Father is not the only time that such a recommendation occurred in this case.   *After* T.D.'s placement with Father, Patton testified that, in an August 25, 2011 report to the Juvenile Court, she was instructed by her supervisor to recommend that T.D. remain in Father's home, even though Patton believed that T.D. should be removed.   (ECF No. 131-10 at 197:14-199:15, 19-24, 200:12-18.) Notably, Patton responded "Yes" when asked if she wanted to remove T.D. because she was afraid for his safety.   (*Id*. at 199:11-15.)   The events running up to Patton's conclusion that T.D. should be removed included reports that (1) T.D. often smelled bad and had unclean clothes, (2) at school, T.D. spent a large amount of time at the nurse's office complaining of sickness and body aches, and appeared to be fearful of Father and at times did not want to go home, and (3) Father hit T.D. across the back with a wooden mop handle.   (*Id*. at 197:14-198:18.)

38

Patton argues that these events, and her wish to remove T.D. from Father's home, should not be considered for purposes of the danger-creation analysis because those things occurred *after* T.D.'s placement with Father, citing *Currier*. (ECF No. 144 at 18-19; ECF No. 204 at 13.) Patton accurately cites pertinent language from *Currier*, however, it does not help her. In *Currier*, the Tenth Circuit declined to consider the defendants' failure to intervene once custody was given to the children's father. 242 F.3d at 919. The reason for this, though, was that the danger-creation theory "focuses on the *affirmative actions* of the state in placing the plaintiff in harm's way." *Id.* (emphasis added). Thus, the defendants' failure to intervene, a non-affirmative action, failed to come within the definition of a state-created danger. *See id.*

Here, Patton's conduct in failing to report her belief that T.D. should be removed and her affirmative recommendation that T.D. remain in Father's home,[23] satisfies the *Armijo* danger-creation requirements. First, the affirmative recommendation that T.D. remain in Father's home, as well as the failure to report Patton's true recommendation, were both considered in *Currier* to be the type of affirmative actions that satisfy *Armijo*. *See id.* ("[the social worker] was responsible for the Children's Court's decision to grant [the father] legal custody, through either his failure to investigate and report to the court or through his affirmative recommendation.") Second, T.D. was a member of a limited and definable group: a child placed into the custody of his natural father. Third, in light of the reports of which Patton was aware from T.D.'s school and mother, and her investigation of the wooden mop incident, her conduct put T.D. at a substantial risk of serious, immediate, and proximate harm. Fourth, the risk was known to Patton. Fifth, Patton acted

---

[23] Plaintiff also relies on another aspect of Patton's post-custody conduct: her failure to visit Father's home at least once every other month. (ECF No. 203 at ¶¶ 51.) Patton disputes whether this fact is actually a fact, but, even if it was, it is not relevant to the danger-creation analysis because a failure to meet, with nothing else, does not constitute affirmative action. *See Currier*, 242 F.3d at 919.

intentionally in conscious disregard of the risk to T.D.  Finally, Patton's conduct could be considered conscience-shocking in light of the fact that she did not recommend removal because she feared for her job, rather than any concern for T.D.'s safety.

The only remaining question is whether any case law in the Tenth Circuit—neither party argues that Supreme Court case law is applicable (*see* ECF No. 144 at 9 n.5; ECF No. 181 at 11)—would have allowed a reasonable official to understand that Patton's conduct violated T.D.'s constitutional right.  On this front, the parties wage battle over a solitary case: *Currier*.  (*See* ECF No. 144 at 19-20; ECF No. 181 at 8-13; ECF No. 204 at 11-18.)  In *Currier*, the Tenth Circuit concluded that a social worker created a danger or increased vulnerability to the danger through: his failure to investigate (1) the numerous bruises on the children and (2) allegations of abuse, and (3) his responsibility for the court order granting legal custody to the father.  242 F.3d at 919-920.  The Tenth Circuit further concluded that the social worker was not entitled to qualified immunity because, by 1993 and 1994, a reasonable official would have known that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional."  *Id*. at 924.  The Tenth Circuit described its application of the social worker's conduct to the danger-creation theory as "a relatively straightforward application of the doctrine."  *Id*. at 924-925.  In contrast, the Tenth Circuit also concluded that another social worker was entitled to qualified immunity because the plaintiffs relied on a "particular theory of danger creation" that was not established in case law.  *Id*. at 925.

In light of the recitation of the facts construed most favorably to plaintiff in Section B.2 *supra*, the Court finds that *Currier* would have allowed a reasonable official in Patton's position to understand that her conduct violated T.D.'s constitutional right.  The Court finds the facts here to

be another "relatively straightforward" application of the danger-creation theory, especially given that Patton's conduct is of a similar ilk to the conduct highlighted in *Currier*. Specifically: the affirmative recommendation in Patton's report that T.D. be placed with Father; Patton's affirmative removal of her concerns about Father from her report;[24] Patton's failure, albeit disputed, to report at least all of her concerns to all of the Team members; Patton's failure, albeit disputed, to report Father's entire criminal history to all of the Team members; the affirmative recommendation in Patton's June 13, 2011 permanency planning hearing report that T.D. remain in Father's house; and Patton's failure to report her belief that T.D. should be removed from Father's house.

As the Tenth Circuit did in *Currier*, the Court views Patton's failures to report in the larger context of the state's affirmative conduct in placing T.D. with Father and then recommending T.D. remain with Father. *See* 242 F.3d at 920 n.7 ("[the social worker's] failure to investigate allegations of abuse should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father.")  This is especially so here, given that so much of Patton's argument is premised on the "involvement of a multi-disciplinary team who issued a group recommendation to the [Juvenile Court]."  (*See* ECF No. 204 at 15-16.) To the extent Patton failed to fully report to the Team members, *inter alia*, her concerns and Father's criminal history, any argument that the Team came to a "group" recommendation is undermined, even more so when certain Team members believed that the recommendation had been made before their participation began.

---

[24] As far as the Court is aware, a copy of the placement report has not been submitted in connection with the motions for summary judgment addressed herein.  The Court relies solely upon Patton's deposition testimony in finding that there is evidence to support plaintiff's contention that Patton removed her concerns from her report after being instructed to do so by her supervisor under threat of job termination. (*See, e.g.*, ECF No. 131-10 at 183:21-185:13, 197:14-199:24.)

Equally important, it is all together unclear how much information regarding Father's entire criminal history was disclosed to the Juvenile Court. Although it is undisputed that the Juvenile Court was informed of the fact that Father had been convicted and sentenced for attempting to sexually assault P.G. (ECF No. 205 at ¶ 7), it is also undisputed that Patton did not attach Father's criminal history record in her reports to the Juvenile Court (ECF No. 203 at ¶ 41). This failure to report Father's full criminal history is important, as plaintiff has presented expert deposition testimony stating that Father's criminal history should have disqualified him being a placement option. (*See* ECF No. 131-16 at 92:5-21.)

As such, the Court finds Patton's alleged conduct to be a relatively straightforward application of this Circuit's well-established law that reckless, conscience-shocking, and affirmative conduct that places a child at substantial risk of serious, immediate, and proximate harm is unconstitutional. *See Currier*, 242 F.3d at 924; *Armijo*, 159 F.3d at 164. Although, Patton's conduct does not precisely fit with the same conduct committed in *Currier* or *Armijo*, the principle that the danger-creation theory focuses upon affirmative action has been recognized since *Armijo*, and, in *Currier*, the Tenth Circuit applied this principle to an affirmative recommendation. Under the circumstances here, the second part of the qualified immunity analysis does not require any greater clarity on a defendant's part than this. *See Currier*, 242 F.3d at 923-924 (explaining the basis for its conclusion that the danger-creation theory was clearly established prior to the defendant's actions).

Patton makes various attempts to distinguish *Currier*. (ECF No. 204 at 11-18.) None are helpful. First, Patton asserts that *Currier* was decided at the motion-to-dismiss stage, and thus, the plaintiffs' allegations were accepted as true. (*Id*. at 11-12.) This is true, but Patton fails to explain

42

how this makes a difference here.  (*See id*.)  As discussed in great detail *supra*, the Court has set forth those material facts that are undisputed.  In addition, in Section B.2 the Court has explained those facts that, although disputed, must be construed in favor of plaintiff for purposes of summary judgment because they are properly supported by evidence in the record.  Second, although Patton asserts that the evidence must be construed in the light most favorable to plaintiff (*id*. at 11-12), Patton proceeds to do the exact opposite.  The Court has discussed in detail *supra* how Patton has wandered far from established summary judgment practice in setting forth the facts, and will not go through that wandering nature again.  Suffice to say, merely because Patton disputes facts such as the basis for Father's probation revocation,[25] the extent that information was relayed to the Team, the extent of Patton's role in recommendations that were made to the Juvenile Court, and the extent that the placement recommendation was a group decision, does not mean that Patton's versions of those facts are the facts for purposes of summary judgment.  *See Tolan*, 134 S.Ct. at 1866-68 (vacating and remanding because the court "credited the evidence of the party seeking summary judgment and failed to properly acknowledge key evidence offered by the party opposing that motion.").

---

[25] The Court will momentarily dwell on Father's probation revocation, as it is the focus of much dispute between the parties.  Patton contends that probation was revoked due to Father's "continued relationship with the mother of his children" (ECF No. 204 at 12), while plaintiff contends that it was revoked due to Father's refusal to participate in sex offender treatment (ECF No. 181 at 11).  The revocation complaint actually states that Father's probation was revoked for multiple reasons.  Specifically, Father "purposely failed to fulfill his treatment obligations," Father "purposely violated his no contact contract with his girlfriend," and Father "had been deceptive in disclosing his relationship with his current girlfriend."  (ECF No. 131-19 at 2.)  The revocation complaint went on to recommend that, "[i]n light of *all* circumstances of this case," Father's probation be revoked.  (*Id*. at 3 (emphasis added)).  In any event, given that Patton testified that she could not recall receiving the revocation complaint (ECF No. 131-10 at 10:23-25), even if Father's probation was revoked solely due to the violation of his no contact contract, this could not have been a basis for Patton's decisionmaking with respect to T.D.

Third, Patton argues that the ages of the children in *Currier*, both of whom were under 4 years of age, is "significant[ly]" different to plaintiff's age when he was returned to Father, which was 14 years. (ECF No. 204 at 15.) Patton cites to Gomez's deposition testimony for the principle that teenagers have the ability to self-report and notify the DDHS of any concerns in the home. (*Id.*) Gomez's testimony does not support this broad principle. Gomez merely testified that, for purposes of *visitation*, "there is a thought process" that teenagers have an ability to self-protect or to self-report what is happening to them. (ECF No. 180-3 at 112:3-25.) Gomez testified that, as a result, *contact* with Father was recommended. (*Id*. at 112:25-113:2.) Nowhere in the cited testimony does Gomez discuss self-reporting as being a reason to place a child with an adoptive or natural parent. In any event, a child's alleged ability to self-report is certainly no reason for a social worker to create a danger or increase vulnerability to a danger.

Finally, the Court acknowledges that Garcia's own role in the recommendation to place T.D. with Father is as disputed as Patton's. (*See, e.g.*, ECF No. 203 at ¶ 76; ECF No. 204 at 15-17.) However, as with all disputed factual issues, they are for the jury to resolve. *See Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 886 (10th Cir. 2014) (affirming the district court's denial of qualified immunity as a matter of law because issues of material fact existed), *cert. denied*, 135 S.Ct. 975 (2015). For purposes of the instant analysis, even if Garcia failed to report the extent of Father's criminal history or object to T.D.'s placement with Father, this does not absolve Patton of her responsibilities to T.D., primary of which was T.D.'s safety. (*See* ECF No. 203 at ¶ 31.)

Accordingly, the Court finds that Patton is not entitled to qualified immunity as a matter of law with respect to plaintiff's danger-creation claim. As a result, Patton's motion for summary judgment is DENIED with respect to the danger-creation claim and that claim only will proceed to trial.

**V.      Conclusion**

For the reasons set forth herein, the Court:

(1)      DENIES plaintiff's motion for partial summary judgment (ECF No. 131); and

(2)      GRANTS IN PART and DENIES IN PART Patton's motion for summary judgment

(ECF No. 144); to wit,

(a)      the motion is GRANTED with respect to plaintiff's claim premised on the

special-relationship theory; and

(b)      the motion is DENIED with respect to plaintiff's claim premised on the

danger-creation theory.

The Order Setting Case for Trial (ECF No. 216) remains in place with respect to defendant

Kelcey Patton.

**SO ORDERED.**

DATED this 8th day of March, 2016.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge