**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Case No. 14-cv-01568-RM-MJW

T.D.,

     Plaintiff,

v.

KELCEY PATTON,
THE DENVER DEPARTMENT OF HUMAN SERVICES,

     Defendants.

---

## OPINION AND ORDER

---

On January 19, 2015, plaintiff T.D. ("T.D." or "plaintiff") filed a Second Amended

Complaint against Kelcey Patton ("Patton") and The Denver Department of Human Services ("the

DDHS"). (ECF No. 94).[1] Therein, plaintiff raised a claim pursuant to 42 U.S.C. § 1983 ("§ 1983")

for injuries he allegedly suffered after being placed with his father ("Father"). (ECF No. 94 at ¶¶ 55-

83.) Plaintiff premised his § 1983 claim under two separate theories of liability: (1) the existence

of a special relationship between plaintiff and Patton (*id*. at ¶ 58); and (2) Patton and the DDHS'

creation of a danger (*id*. at ¶¶ 59, 72). Plaintiff sought solely monetary damages. (*Id*. at 9.)

Pending before the Court is the DDHS' motion for summary judgment ("the motion for

summary judgment") (ECF No. 135) and statement of undisputed material facts (ECF No. 135-1).

---

[1] T.D.'s mother, Regina Garcia, was named as a plaintiff in the Original Complaint (ECF No. 4) and the First Amended Complaint (ECF No. 84), but was omitted as a plaintiff in the Second Amended Complaint.

Plaintiff filed a response to the motion for summary judgment (ECF No. 183), and a response and additional facts to the DDHS' statement of undisputed material facts (ECF No. 184).  The DDHS then filed a reply (ECF No. 201) and a reply statement of undisputed material facts ("the RSUMF") (ECF No. 201-1).

For the reasons discussed herein, the motion for summary judgment is GRANTED.

## I.   Legal Standard for Summary Judgment

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial.  *Id.* at 324.  A fact is material if it has the potential to affect the outcome of a dispute under applicable law.  *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  An issue is genuine if a rational trier of fact could find for the non-moving party.  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party.  *Id.*  However, a mere "scintilla of evidence" is insufficient to avoid summary judgment.  *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).  Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor."  *Id.*

## II.     Eleventh Amendment Immunity

The Eleventh Amendment bars suit in federal court against a state; it does not, however, bar suits against counties, municipal corporations, or political subdivisions. *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000).  The prohibition of suits against a state includes suits against arms of the state.  *Id*.  In determining whether an entity is an 'arm of the state,' the Tenth Circuit has set forth the following inquiry.  First, a court looks to the level of autonomy of the entity, looking specifically at the characterization of the entity under state law, as well as the extent of guidance and control exercised over the entity by the state. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996).  Second, a court looks at the entity's financing, specifically, the amount of financing received independent of the state and the entity's ability to provide its own financing. *Id*. at 574-575.  The entity is immune from suit "if the money judgment sought is to be satisfied out of the state treasury." *Id*. at 575 (quotation omitted).  In performing this inquiry, a court must make reference "to the particular state laws characterizing the entity," and, although state court decisions regarding whether an entity is an arm of the state are not dispositive, they may be given "some deference." *Sturdevant*, 218 F.3d at 1164.  Once an Eleventh Amendment defense is asserted, resolution of the same is obligatory. *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008).

## III.    Discussion

### A.     Liability

The Court begins its Eleventh Amendment inquiry with attempting to identify the legal liability for any monetary judgment that may be entered against the DDHS. *See Sturdevant*, 218 F.3d at 1165.  This, however, may be a fool's errand for, as the DDHS acknowledges, there is "confusion

regarding payment of a judgment." (ECF No. 201 at 8.) Suffice to say, the Court agrees with the DDHS. Notably, the parties have submitted no conclusive evidence from which source any money judgment would be paid, and the statutory law governing human services in Colorado provides no guidance on this matter either. The closest the DDHS could come to pinning down from where any monetary judgment would be satisfied was an affidavit from the Manager of the DDHS, in which the Manager asserted that, "to the best of [her] knowledge," a money judgment would have to be paid out of the DDHS' "general fund," which, she asserts, is made up of approximately 80 percent state and federal funding and 20 percent city funding. (ECF No. 201-2 at ¶ 7.) Although this speculation is all well and good, it brings the Court little closer to determining who is legally liable for any monetary judgment.

Further, by referencing the "general fund," presumably the DDHS is referring to the "social services fund" created in the Colorado Human Services Code ("the CHSC"). (*See* ECF No. 201 at 7); *see also* Colo. Rev. Stat. § 26-1-123. The DDHS asserts that the 'general fund' "is the only fund available" to satisfy a monetary judgment. (ECF No. 201 at 7.) As discussed *infra*, whether or not the general fund or social services fund is made up of 80 percent state funding is far from conclusive, and likely inaccurate. However, assuming for present purposes that the fund is so funded, and further assuming that the fund is from where a monetary judgment would be satisfied, that would put a severe dent in the DDHS' position that it is entitled to Eleventh Amendment immunity.

Section 26-1-123 of the CHSC provides that the social services fund "shall be available for the program and administrative costs of the county department." Colo. Rev. Stat. § 26-1-123(2). Fortunately, "program costs" and "administrative costs" are defined in § 26-1-122. Specifically, "program costs" include amounts expended for assistance payments and social services under

4

programs for aid to the needy disabled, aid to the blind, child welfare services, expenses related to preventing blindness or restoring eyesight, funeral and burial expenses, and state supplementation of social security. *Id*. § 26-1-122(4)(c). Amounts paid to satisfy monetary judgments are not included. "Administrative costs" include salaries of county department employees, county payments related to certain types of insurance for employees' and employees' retirement plans; necessary travel expenses, necessary telephone and telegraph, necessary equipment and supplies, necessary postage and printing, and "such other administrative costs as may be approved by the state department." *Id*. § 26-1-122(3)(c).

If "such other administrative costs" do *not* include costs to satisfy a monetary judgment, then there is no basis under §§ 26-1-122 and -123 for the social services fund to be considered the pot from which a monetary judgment may be satisfied. In that situation, for satisfaction of a monetary judgment to be considered an administrative cost would require a statutory amendment by the Colorado General Assembly. Even worse for the DDHS, though, is if the social services fund *does* turn out to be the money pot that the DDHS advocates it is. This is because the Tenth Circuit has instructed courts not to look at the practical effect of a money judgment, in terms of who or what ultimately ends up paying it, but, instead, to focus on the legal liability for a judgment. *Duke v. Grady Mun. Sch.*, 127 F.3d 972, 981 (10th Cir. 1997). Here, if payment of a monetary judgment is obtained from the county social services fund, then that would strongly suggest that the county is legally liable for said judgment for the simple reason that the county social services fund has been expressly "created and established in each of the *counties* of the state of Colorado." *See* Colo. Rev. Stat. § 26-1-123(1) (emphasis added). Moreover, it is the *county* board that is charged with administering the social services fund, albeit pursuant to state department rules, and the *county*

treasurer is designated as the treasurer and custodian of the fund. *Id*. § 26-1-123(3)(a). In this light, the county social services fund appears to be a county fund, not a state one.

The Tenth Circuit's discussion of this issue in *Duke* is instructive. In that case, a school district in New Mexico received 98 percent of its funds from the state. *Duke*, 127 F.3d at 980. Because of this, "as a *practical* matter," a monetary judgment against the school district would be paid by the state treasury. *Id*. at 980-981 (emphasis in original). Despite this, based upon decisions from the U.S. Supreme Court, the Tenth Circuit explained that "'[t]he question is not who pays in the end; it is who is legally obligated to pay the judgment that is being sought.'" *Id*. at 981 (quoting *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 428, 117 S.Ct. 900 (1997)) (internal quotation omitted). In *Duke*, this meant that "this most important factor" weighed against Eleventh Amendment immunity because the state was not legally liable for a judgment against a school district. *Id*.

Nevertheless, as mentioned, in this case the DDHS' pyrrhic reliance on the county social services fund is, at best, merely based on the speculation of its Manager. There is no evidence, either for or against, that the State of Colorado would be liable for any judgment against the DDHS. As a result, although the DDHS may not be entitled to immunity based on liability alone, that does not end the Eleventh Amendment inquiry because the Tenth Circuit has explained that, even if legal liability cannot be ascertained, an entity may still be an arm of the state if "the other factors decisively resolve the question in favor of Eleventh Amendment immunity." *Sturdevant*, 218 F.3d at 1166.

## B.  Characterization Under State Law

This factor is decisively in favor of arm-of-the-state status. The Colorado statutory framework for creation of the state-wide department of human services and the corresponding

6

county-based departments is encompassed in Colo. Rev. Stat. § 26-1-101, *et seq.* Section 26-1-118 expressly provides that county departments "shall serve as agents of the state department." Colo. Rev. Stat. § 26-1-118(1). In addition, the Colorado Supreme Court considers county departments to be agents of the state. *Romer v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo, Colorado*, 956 P.2d 566, 574 (Colo. 1998) ("*Cnty. of Pueblo*") ("The Colorado Services Code [ ] is unmistakably clear in pointing out that a county board is an agent of the state when it makes expenditures for social services.") (citing Colo. Rev. Stat. § 26-1-118(1)). Although state court decisions on this issue are not binding, the Tenth Circuit has deferred to the rationale of Colorado courts to the extent they interpret state law, *see Sturdevant*, 218 F.3d at 1167, and the Court will do so here.

Plaintiff makes various arguments in an effort to undermine the clarity of the statutory language, none of which are helpful. Plaintiff argues that the statutory characterization is "ambiguous," first, because the county department is called a county department. (ECF No. 183 at 8.) This argument seems at best to miss the point. The fact that the county department is *labeled* a county department has no relevance to whether or not the same is an arm or agent of the state; the label is merely a way to differentiate county departments from the state department of human services. Next, plaintiff asserts that county departments can be an agent of the courts and also act as agents of the City and County of Denver. (*Id.*) As for being an agent of a court, the statute actually provides that "the county director shall perform under the supervision of such court the function of officer or agent of the court in any social services matters which may be before it." Colo. Rev. Stat. § 26-1-118(4). The Court notes that this provision is included in the same statutory section where the county *department*, rather than the *director*, is expressly designated as an agent of the state department. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757

(1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another").  This is especially so in this instance, given that the term department is used repeatedly in the statutory section, while the term director is used, in relevant part, only once, *see generally* Colo. Rev. Stat. § 26-1-118.[2]

As for the DDHS being an agent of the City and County of Denver this is unsupported by the evidence to which plaintiff cites.  Plaintiff cites to a letter sent to Patton.  (ECF No. 201-1 at ¶ 2.) This is a letter containing an offer of employment to Patton.  (ECF No. 184-1.)  Unsurprisingly, nowhere therein is the DDHS' supposed role as agent for the county mentioned.  (*See generally id.*) In fact, the only mention of the county is in the letterhead.  (*See id.*)  As before, the mere fact that the DDHS is labeled as a county department has no bearing on whether it is an arm or agent of the state.  *See Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) ("Simply stated, [a court] conduct[s] a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state.")  Plaintiff's second piece of evidence is equally irrelevant.  This time, plaintiff cites to a "Site Use License Agreement."  (ECF No. 201-1 at ¶ 2.)  In violation of this Court's Civil Practice Standards, plaintiff provides no pinpoint citation from which the Court could determine which part of the 15-page exhibit might potentially be relevant to this analysis.  (*See id.*); *see also* Civil Practice Standard IV.B.2.b.ii.  In any event, plaintiff is presumably referring to the statement in the agreement that the City and County of Denver is acting by and through the DDHS. (*See* ECF No. 184-1 at 1.)  Plaintiff provides no explanation, though, on how the description of the

---

[2] The only other time that the term "county director" is used in this section is in providing that the director may designate additional categories of workers who should receive fraud prevention training. Colo. Rev. Stat. § 26-1-118(8).

parties in a wholly unrelated agreement is pertinent to, or undermines, the clear language of the Colorado statute.  (*See* ECF No. 183 at 8.)

### C.    State Control

The second part of the autonomy inquiry is the level of guidance and control exercised over the DDHS by the state. *Watson*, 75 F.3d at 574.  In performing this analysis, the Tenth Circuit has looked at state control over an entity's use of property, the relationship with its employees, the handling of its finances, and its auditing and reporting requirements.  *See Steadfast*, 507 F.3d at 1254-55.  The Tenth Circuit has also considered relevant whether the subject entity is concerned primarily with local or state concerns, and/or whether the entity consists of members who are locally elected or state appointed.  *See Sturdevant*, 218 F.3d at 1168-69.

Section 26-1-118 of the CHSC sets forth the "[d]uties" of county departments, such as the DDHS.  The DDHS is subject to reporting to the state department "at such times and in such manner and form" as the state directs.  Colo. Rev. Stat. § 26-1-118(2).  More generally, the DDHS is "charged with the administration of public assistance and welfare and related activities … in accordance with the rules and regulations of the state department." *Id*. § 26-1-118(1).  However, merely because a state department may regulate aspects of a state-wide system as a whole, does not mean that a county department cannot have significant autonomy as well.  *See Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 995-996 (10th Cir. 1993) (explaining that, although the state board of education regulated matters related to the school system as a whole, local school boards exercised sufficient autonomy without state control so as not to be considered arms of the state for purposes of the second part of the Eleventh Amendment analysis).

This then leads to what, if any, responsibilities the DDHS exercises without state control. One area is in the DDHS' relationships with its employees. The DDHS asserts that the state controls this aspect of its administration in that the state fixes minimum standards and qualifications for county personnel and establishes salary schedules, to all of which a county is bound. (ECF No. 201 at 6.) However, the Colorado Supreme Court disagrees with the DDHS' argument on this point. In *Norton v. Gilman*, 949 P.2d 565, 566-567 (Colo. 1997), the Colorado Supreme Court addressed whether the director and supervisors of a county social services department were employees of the state or the county. In resolving this question, "the most important factor" was the alleged employer's right to control the details of the employee's performance. *Id*. at 567. After thoroughly analyzing applicable provisions of the CHSC, the Colorado Supreme Court determined that the director and supervisors were not employees of the state. *Id*. at 568-569. Specifically, the Colorado Supreme Court explained that, although the county operated within a regulatory framework set by the state, the county exercised daily control over the director and supervisors, the county had the power to hire and fire the director and supervisors, and the county had primary or significant responsibility for the salaries of the director and supervisors. *Id*. As in *Sturdevant*, to the extent that the Colorado Supreme Court's decision in *Norton* was based on its interpretation of state law, the Court deems it appropriate to defer to its reasoning. *See Sturdevant*, 218 F.3d at 1167. Moreover, since 2001, "the merit system for the selection, retention, and promotion of employees of the county departments" has been vested in the county departments, following the abolition of the state-department-run merit system. *See* Colo. Rev. Stat. § 26-1-120(1).

Nonetheless, although *Norton* supports a finding that day-to-day responsibility over the DDHS' employees is not vested in the state, this too does not resolve the question of the state's

overall control of the DDHS; it is merely one part of it.  *See Steadfast*, 507 F.3d at 1254-55.  Other than arguments related to the appointment of the director and reorganizing employee functions, plaintiff raises only three other arguments in this regard.  First, plaintiff asserts that the DDHS describes the Mayor of Denver as its top executive.  (ECF No. 183 at 9.)  The Court can discern no relevance from this assertion, especially in light of the fact that *the statute* expressly charges the county director "with the executive and administrative duties and responsibilities of the county department …."  Colo. Rev. Stat. § 26-1-117(1).[3]  Second, plaintiff again raises the specter of the DDHS' letterhead.  (*See* ECF No. 183 at 9.)  As the Court explained *supra*, the DDHS' letterhead has absolutely no relevance to whether the DDHS is controlled, and to what extent, by the county or the state.

Third, plaintiff disputes the persuasiveness of the DDHS' contention that its budget is subject to state review.  (ECF No. 183 at 10.)  This plays into the larger area concerning the handling of the DDHS' finances.  With respect to the DDHS' budget, the Colorado Supreme Court differs with plaintiff's interpretation of the relevant statutory provision.  In *Cnty. of Pueblo*, the Colorado Supreme Court, in explaining why a county social services department was an agent of the state, relied, in part, on the fact that "a county may not adopt a social services budget until it has been submitted to the state for review."  956 P.2d at 574.  Thus, the state's review of a county's social services budget was clearly of some persuasion to the Colorado Supreme Court.  The Colorado Supreme Court also relied upon statutory provisions providing that "the county social services fund

---

[3] Plaintiff attaches some form of diagram to support this assertion.  (*See* ECF No. 184-3.)  However, whether or not that diagram places the Mayor of Denver at the top of what appears to be an organizational chart of the DDHS, it does nothing to displace the clear language of the statute.  *See Ambus*, 995 F.2d at 994 ("We believe that the immunity issue must be determined in each case on the basis of the individual state laws involved.").

must be administered in accordance with state rules," and, in an extreme case where a county has failed to comply with state rules, "the state may terminate all financial assistance to the county and directly administer the social services programs of the county." *Id*. As with the Colorado Supreme Court's interpretation of state law with respect to control over county employees, the Court will defer to the Colorado Supreme Court's interpretation of state law with respect to the handling of the county's social services budget. *See Sturdevant*, 218 F.3d at 1167.

In addition to those statutory provisions relied upon by the Colorado Supreme Court, further review of the CHSC reflects thorough state control over the appropriation of funds for and financial monitoring of programs and costs related to human services. Section 26-1-122 regulates county appropriations and expenditures for programs and services. *See generally* Colo. Rev. Stat. § 26-1-122. First, the statute requires the board of county commissioners to annually appropriate sufficient funds to defray the county's share of the overall cost of providing programs and services, and requires that additional funds be made available if county funds prove insufficient to meet its share. *Id*. § 26-1-122(1)(a), (c). Second, county departments are mandated to keep records and accounts as prescribed by the state relating to the costs of administering assistance payments, food stamps, and social services, and the program costs of assistance payments and social services. *Id*. § 26-1-122(3)(a), (4)(a). Third, the statute sets forth precisely what may be considered administrative and program costs. *See id*. § 26-1-122(3)(c), (4)(c). Fourth, if the state's funding appropriation is insufficient to meet its share of the cost for providing programs and services, the state board of human services is authorized to temporarily reduce programs. *Id*. § 26-1-122(5). In addition, the DDHS is required to provide access to all of its records for a financial or performance audit, and the state auditor has access to all of the DDHS' books, reports, and other records at all

times.  Colo. Rev. Stat. §§ 26-1-114.5(1)(a), (5), 2-3-107(2)(a).  In this light, it appears that the state intended all aspects of the handling of a county's finances for human services to be controlled by the state.

This leaves whether the primary concern of the DDHS is local or state problems.  In 1997, the Colorado General Assembly restructured the delivery system for health and human services, declaring

> its support for local flexibility in the planning and delivery of health and human services and states its intent to foster continuing coordination, communication, and collaboration at the local level.  The general assembly further states its support for local decisions to utilize people and resources at the local level in a more efficient, effective, and economical manner through consolidation of local advisory boards.

Colo. Rev. Stat. 24-1.7-101.  In addition, the Colorado Supreme Court has noted "the mixed state and local character of social services." *Romer v. Bd. of Cnty. Comm'rs for Cnty. of Weld, State of Colorado*, 897 P.2d 779, 782 (Colo. 1995).  More specifically, the Colorado Supreme Court explained that, "[b]y upholding different tax rates for each county to effect a fair share of the burden, the local character of social services was established." *Id*.  In this light, as well as the fact that the CHSC establishes departments in each county, *see* Colo. Rev. Stat. § 26-1-115, it is evident that those departments are primarily concerned with local problems, rather than state-wide problems. *Cf. Davidson v. Sandstrom*, 83 P.3d 648, 656 (Colo. 2004) (concluding that judicial districts in Colorado are political subdivisions, in part, because "[e]ach judicial district represents a finite geographical area, and exists to provide judicial services to residents of that district or those who have transacted business in that district.")

With regard to whether the members of the DDHS are locally elected or state appointed, the director of the DDHS is charged "with the executive and administrative duties and responsibilities

of the county department ….." Colo. Rev. Stat. § 26-1-117(1). The director, though, is appointed by the county board. *Id*. Thus, the question is who politically controls the county board. Unlike other counties in Colorado, in the City and County of Denver, the members of the DDHS' board are not made up of the members of the board of county commissioners; instead, the board constitutes "the department or agency with the responsibility for public assistance and welfare activities." *See* Colo. Rev. Stat. § 26-1-116(1)(a).

Here, the parties appear to agree that the "department or agency" referenced in the statute is, somewhat counter-intuitively, the Mayor for the City and County of Denver. *See* ECF No. 201 at 10 ¶ 4 (explaining that the DDHS' "Charter" delegates the responsibility for public assistance and welfare activities "to the Mayor."). Thus, it would appear that the members of the DDHS' board are not appointed by the State of Colorado. *Cf. Sturdevant*, 218 F.3d at 1168-69 (relying, in part, on the fact that a board was made up predominately of members appointed by the state executive in finding state control over the board); *Sutton v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1232-33 (10th Cir. 1999) (finding that the Utah State School for Deaf and Blind was an arm of the state, even though the school exercised control similar to the control of a local school district and it was not clear how the school would satisfy a money judgment against it, because the members of the school's board were members of the State Board of Education); *Ambus*, 995 F.2d at 996 (relying, in part, on the fact that a school district's board consisted of members elected locally by voters in finding a lack of state control). However, neither party makes an argument related to the political control of the DDHS, and thus, without any briefing, the Court declines to place undue weight on this issue.

In summary, the question of the extent of the state's control over the DDHS is a mixed bag between aspects that indicate state control, such as the state's thorough control of the handling of the

14

DDHS' finances, and elements that indicate a lack of control, such as the DDHS' day-to-day control over its employees and the local nature of its services. Nonetheless, although the DDHS' activities may primarily be local in nature, that does not defeat the fact that those activities are still, to a large extent, controlled and supervised by the state. For example, take child welfare services. The CHSC contains a separate article to govern child welfare services, and it sets forth precisely who is in control of providing those services. Notably, "[t]he state department shall adopt rules to establish a program of child welfare services, administered by the state department or supervised by the state department and administered by the county departments …." Colo. Rev. Stat. § 26-5-102(1)(a). Moreover, elsewhere in the Colorado Revised Statutes, the state department is also charged with training county departments with respect to numerous duties, including the investigation of child abuse reports. *See* Colo. Rev. Stat. § 19-3-313.5.

### D. Degree of State Funding

The CHSC provides that, other than where a county wishes to match federal funds in certain situations or where the state department approves a social services activity as eligible for federal reimbursement, "[u]nder no circumstances shall any county expend county funds in an amount to exceed its twenty percent share of actual costs for assistance payments, food stamps … and social services activities, including the administrative costs of each." Colo. Rev. Stat. § 26-1-122(1)(d), (4)(h), (i). The remaining 80 percent share for administrative and program costs "shall be advanced to the county by the state treasurer from funds appropriated or made available for such purpose, upon authorization of the state department." *Id*. § 26-1-122(3)(b), (4)(b). This 80 percent share is made up of funds from the state and federal governments. *See id*. § 26-1-123(2).

Plaintiff argues that the county's actual share is "at least 37%," citing an exhibit containing the 2015 Mayor's budget for the City and County of Denver. (ECF No. 183 at 11; ECF No. 184-5 at 5.) In that exhibit, next to certain figures for revenues related to "Human Services," someone has written the word "37%" next to the number "$57,969,000," which appears to represent the alleged property taxes appropriated for human services. (*See* ECF No. 184-5 at 5.) Assuming whoever has written on the exhibit is mathematically literate and has accurately calculated the percentage of revenues derived from property taxes as compared to the total revenues appropriated, this unauthenticated exhibit does not suggest that which plaintiff contends. Notably, the only indication that the revenues for human services in the purported budget include funds from the state and federal governments is a line item labeled "Intergovernmental." (*See id.*) Plaintiff provides no support from any source that the revenue amount credited to this line item actually constitutes the total amount of state and federal assistance received by the City and County of Denver for its human services budget. In that regard, the DDHS has submitted an affidavit from the Manager of the DDHS, which states that the exhibit does not reflect funds from the state and federal governments, but only reflects funds received directly from "the City." (*See* ECF No. 201-2 at ¶¶ 2-5.) In light of the clear language of the CHSC, with respect to the county only having to fund 20 percent of the DDHS' overall costs, *see* Colo. Rev. Stat. § 26-1-122(1)(a), the Court is inclined to agree with the Manager of the DDHS about the pertinence of plaintiff's exhibit, *see also Baca v. Clark*, 2007 WL 2022054, at *6 (D. Colo. 2007) ("'It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.'") (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)).

For its part, the DDHS argues that the "majority" of its budget comes from state and federal sources, and 80 percent of its "general fund" consists of moneys from the state. (ECF No. 201 at 7.)[4] This argument, however, misplaces the focus of the funding inquiry. Specifically, the focus of this inquiry is state funding; not state *and* federal funding combined. *See Watson*, 75 F.3d at 574-575. This is especially so here where the Colorado Supreme Court has noted that "much of the State's funding ultimately comes from the federal government." *Norton*, 949 P.2d at 568 n.7. There is no evidence before the Court as to the exact breakdown of *direct* state funding, as opposed to joint state and federal funding, for the DDHS' budget. Moreover, to the extent any argument could be made that joint state and federal funding is in reality just state funding, that reality is belied by the CHSC. Notably, § 26-1-109 provides that the state treasurer shall act as "ex officio custodian of all public assistance and welfare funds received by the state from the federal government," and is directed to "hold each such fund *separate and distinct from state funds* and is authorized to make disbursements from such funds for the designated purpose or for administrative costs, which may be provided in such grants ...." Colo. Rev. Stat. § 26-1-109(2)(b), (c) (emphasis added). Thus, it would be hard to argue that federal funding is in reality state funding, at least for purposes of this analysis.[5]

As such, on the current record, the extent-of-state-funding factor weighs "in on both sides of the arm-of-the-state/political subdivision scale." *See Sturdevant*, 218 F.3d at 1170 (finding that,

---

[4] Plaintiff contends that only 55 percent of the DDHS' budget comes from state or federal funding, however, that assertion also appears to be based upon the less than pertinent exhibit discussed *supra*. (*See* ECF No. 183 at 11.)

[5] There is another fund created by the CHSC from which the DDHS could be funded by the state treasury. That is the county tax base relief fund or contingency fund created in § 26-1-126. However, the DDHS has presented no evidence regarding whether the DDHS actually receives any moneys from said fund, nor made any argument in that regard. (*See generally* ECF No. 135 at 5-6; ECF No. 201 at 6-8.) Moreover, the Colorado General Assembly is under no obligation to appropriate moneys for the tax base relief fund. *See* Colo. Rev. Stat. § 26-1-126.5; *Cnty. of Pueblo*, 956 P.2d at 571.

although funding for the State Board of Community Colleges exhibited similarities with the way local school districts were funded, the funding was qualitatively different due to the state's "direct supervision" of the way that the funds, whatever their source, were raised and spent). Here, it is not at all clear to what extent the DDHS relies upon direct state funding, however, even if the DDHS' reliance on the state was minimal, as discussed *supra*, the state has direct control over the DDHS' raising and spending of money.

### E.   Bonds and Taxes

Unlike other parts of the instant analysis, this factor is far more straightforward. Notably, there is no power vested in the DDHS, or any other county department, to issue bonds or levy taxes. Plaintiff does not argue otherwise. (*See generally* ECF No. 183 at 10-12.) Therefore, this factor weighs in favor of arm-of-the-state status. *See Sturdevant*, 218 F.3d at 1170 (explaining that the power to levy taxes is a "characteristic attribute of a political subdivision").

### F.   Finding

Whether or not the DDHS is an arm of the state is a much closer question than the DDHS suggests in its pleadings.[6] Notably, there is (1) no evidence from where the DDHS would satisfy a monetary judgment; (2) no evidence, even if a source could be identified, as to what extent the state would contribute thereto; (3) the Colorado Supreme Court's conclusion that the day-to-day control over DDHS employees is with the DDHS; (4) persuasive findings from the Colorado General

---

[6] In its pleadings, the DDHS cites to numerous cases from this District and various Colorado state courts, concluding that county departments of human services are either arms of the state for purposes of Eleventh Amendment immunity or are considered agents of the State of Colorado under state law. (*See* ECF No. 135 at 6, 8; ECF No. 201 at 3-4, 9.) Those decisions are not binding on this Court, and, after thorough review, the Court did not find them persuasive enough simply to rely on them without engaging in its own independent analysis. Thus, the Court's findings herein do not rely in any part upon those decisions.

Assembly and the Colorado Supreme Court pertaining to the local nature of the services provided by entities such as the DDHS; and (5) the undisputed fact that control of the county board is placed in the Mayor for the City and County of Denver.  These factors all weigh against finding the DDHS to be an arm of the state.

Nonetheless, the Court finds the more compelling factors on the other scale.  Most notably, the state department of human services exercises wide-ranging and comprehensive control over the activities in which the DDHS engages.  More specifically, under the CHSC, it is the state department that is charged with the "administration or supervision of *all* public assistance and welfare activities of the state."  Colo. Rev. Stat. § 26-1-111(1) (emphasis added).  The state department is further charged with organizing and supervising county departments with respect to public assistance and welfare.  *Id*. § 26-1-111(2)(d)(I).  As pertinent to the instant analysis, some of the results of this wide-ranging and comprehensive control are that the state or state department establishes the reporting and auditing requirements of the county departments, establish rules for welfare programs, and control the handling of the county departments' finances.  In addition, the DDHS has no power to issue bonds or levy taxes—characteristic attributes of a political subdivision as opposed to an arm of the state.  *See Sturdevant*, 218 F.3d at 1170.  Ultimately, the DDHS' inability to raise any revenues on its own initiative, and the state's significant control over even those moneys that the DDHS does receive, demonstrates the DDHS' reliance upon, and its status as an arm of, the state.[7]

---

[7] In no way to undermine the Court's finding that, *in this case*, the DDHS is entitled to Eleventh Amendment immunity, the Court feels it is prudent to acknowledge the following three issues that, if properly raised, argued, and supported, may result in a different outcome in a future case.

First is the U.S. Supreme Court's instruction in *Doe*, and reiterated by the Tenth Circuit in *Duke*, that the Eleventh Amendment's key concern is with who is legally obligated to pay the judgment being sought.  *Doe*, 519 U.S. at 428; *Duke*, 127 F.3d at 981.  Here, there is no evidence regarding whether the State of Colorado would be legally liable for any judgment rendered against the DDHS in this case.  Thus, on this occasion, the Court has not been able to determine the same.

19

As a result, the DDHS is entitled to Eleventh Amendment immunity, barring plaintiff's claim for damages against it. *See Watson*, 75 F.3d at 574. For that reason, the DDHS' motion for summary judgment (ECF No. 135) is GRANTED.

## IV.    Final Observations

Because of the close nature of the above analysis, the Court will make the following additional observations about the nature of plaintiff's claim against the DDHS. In the Second Amended Complaint, plaintiff raises one cause of action. (ECF No. 94 at 7.) That cause of action contains numerous allegations, all but two of which are solely directed at co-defendant Patton. The only allegations against the DDHS are that it "created the danger or increased T.D.'s vulnerability to the danger," and "Patton acted pursuant to policy and custom of the Department." (*See id.* at ¶¶ 72, 82.) For argument's sake, and construing these allegations incredibly liberally, plaintiff raised a claim premised on the danger creation theory under 42 U.S.C. § 1983. Understandably, though, as the DDHS asserts in its motion for summary judgment, it sought further clarification as to precisely what it was alleged to have done wrong. (*See* ECF No. 135 at 10.) Specifically, the DDHS served plaintiff with a set of interrogatories, requesting, *inter alia*, a description of the policy and custom referenced in the complaint. (*See id.*; ECF No. 135-3 at 9.) In response, plaintiff objected on the ground that discovery was on-going, and stated that the DDHS "has a custom of placing

---

Second is the Tenth Circuit's explanation that a *fundamental* characteristic of a political subdivision is "political control by some community other than the state as a whole." *Sturdevant*, 218 F.3d at 1170. Here, although the parties appear to agree that the county board is effectively the Mayor for the City and County of Denver (*see* ECF No. 201-1 at 10 ¶ 4), they fail to discuss the applicability of this fundamental characteristic of a political subdivision or the weight that should be assigned to it.

Third is the Colorado Supreme Court's holding in *Davidson* that the judicial districts of Colorado are political subdivisions because each district represents a "finite geographical area" for the purpose of providing judicial services to that district's residents, and the district attorney for each district is "elected solely by the voters of their judicial district." *See Davidson*, 83 P.3d at 656. Although the situation appears similar here in the context of the services the DDHS provides, again, neither party has briefed whether *Davidson*, or at least its reasoning, is applicable here.

and/or keeping children in homes that are dangerous and/or increase a child's vulnerability to danger." (ECF No. 135-3 at 9.) With no apparent supplement to plaintiff's interrogatory response, the DDHS proceeded to address its arguments and evidence in the motion for summary judgment and statement of undisputed material facts toward the custom set forth in plaintiff's interrogatory response. (*See generally* ECF No. 135 at 10-19; ECF No. 135-1 at ¶¶ 7-18.) Specifically, the DDHS focused its arguments on whether it had a formal policy or informal custom of placing children in danger. (*See* ECF No. 135 at 10-19.)

In response to the motion for summary judgment, plaintiff argued that the DDHS was liable "if one of its employees authorizes an unconstitutional action and that decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. (ECF No. 183 at 13 (quotation omitted)). This theory of municipal liability was not alleged in the Second Amended Complaint, and, as evidenced by the arguments in the motion for summary judgment, was not anticipated by the DDHS. Therefore, even if the Court had reached beyond the Eleventh Amendment issue in this case, the Court would have declined to consider the merits of plaintiff's final-policymaker theory of liability. *See Fuqua v. Lindsey Mgmt. Co., Inc.*, 321 F. App'x 732, 734-735 (10th Cir. 2009) (explaining that "[n]ormally a claim or theory that is not adequately raised in the complaint will not be considered," and finding no abuse of discretion in failing to permit the plaintiffs to amend their complaint because they did not provide the district court with adequate notice that they wanted to do so.") Here, plaintiff has not sought leave to amend his complaint for the third time.[8] Moreover, even if he did, the Court would not grant it because the deadline to amend

---

[8] With regard to seeking leave to amend, plaintiff objected to the DDHS' interrogatory on the ground that discovery was ongoing. (ECF No. 135-3 at 9.) However, despite discovering the alleged basis of its claim during Patton's deposition testimony, plaintiff never moved to amend his complaint on this basis.

pleadings has passed, and plaintiff has shown no good cause for failing to move to amend sooner, given that the deposition testimony upon which he relies for the new theory of liability was taken on December 11, 2014. (*See* ECF No. 183 at 13-14; ECF No. 184-19); *see also Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (explaining that, after a scheduling order deadline, a party seeking leave to amend must demonstrate, *inter alia*, good cause for seeking modification under Fed.R.Civ.P. 16(b)(4)).

Plaintiff also argues in his response to the motion for summary judgment that the DDHS had a custom of disregarding safety concerns, relying again on Patton's deposition testimony. (ECF No. 183 at 15-16.) However, plaintiff cites to only one case in the two pages of text dedicated to this particular theory of liability, and that citation is misplaced. (*See id*.) Plaintiff quotes *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702 (1989), in connection with his argument that disregarding safety risks was a "'standard operating procedure'" of the DDHS. (*Id*. at 15 (quoting *Jett*, 491 U.S. at 737)). The cherry-picked language from *Jett*, though, relates to the U.S. Supreme Court's discussion of when an official's *final policymaking authority* may result in liability; not when an office's custom may do so. *See Jett*, 491 U.S. at 737-738; *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (explaining that a municipality may be liable for a policy or custom, and further explaining that a policy or custom may take various different forms, including, a formal policy, an informal custom, or the decision of an employee with final policymaking authority).

In any event, even if plaintiff accurately cited *Jett*, he fails to explain how, in light of that decision, Patton's deposition testimony establishes a DDHS custom of disregarding a safety risk to children. The cited portion of *Jett* contains no factual discussion, rather, it merely sets forth the legal

framework to be used in determining whether an official has final policymaking authority.  Given that plaintiff cites to no other cases with respect to this theory of liability, that is a problem because plaintiff's remaining recitation of Patton's deposition testimony is entirely bereft of connection to any actual law by which this Court could determine whether (a) the DDHS did, in fact, have a custom of disregarding the risk of safety to children, and (b) there was a direct causal link between that custom and plaintiff's alleged injury.  *See Bryson*, 627 F.3d at 788 (explaining that to establish municipal liability under § 1983 requires the existence of a municipal policy or custom, and a direct causal link between the same and the injury alleged).  For example, plaintiff asserts that Patton testified that the DDHS' administrator ordered her to take out safety concerns and that in half of Patton's cases she was required to make a decision that was not in the best interests of the child. (ECF No. 183 at 15.)  Nowhere, though, does plaintiff explain how, even if true, the administrator's conduct would constitute an office custom for purposes of § 1983 liability.[9]

Although at this stage the Court must construe the factual record in a light most favorable to plaintiff, that is not just what the Court would be required to do here.  The Court would also be required to perform plaintiff's legal research, apply that research to the facts viewed in plaintiff's favor, and then draw conclusions on plaintiff's behalf.  This the Court may not do even for *pro se* parties, which plaintiff is not.  *See United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[B]ecause [the petitioner] appears pro se, we must construe his arguments liberally; this rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.")

---

[9] In addition, in citing to Patton's deposition testimony, plaintiff cites to "Pl.'s Add'l Fact ¶ 84," as well as to paragraphs 85 through 88.  (ECF No. 183 at 15-16.)  The Court's Civil Practice Standard is clear that, when a party wishes to file more than 40 additional facts in response to a motion for summary judgment, the party must seek leave to do so *prior* to filing the response statement.  Civil Practice Standard IV.B.2.b.ii.  This plaintiff did not do and still has not done.  Thus, the Court would not have considered any of plaintiff's additional facts above the first 40, even if the Eleventh Amendment issue had been resolved against the DDHS.

Finally, the DDHS met its initial burden as the summary-judgment movant of pointing out to the Court a lack of evidence on an essential element of plaintiff's claim. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-671 (10th Cir. 1998) ("a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."). Specifically, the DDHS argued, *inter alia*, that there was no evidence that a custom existed of disregarding safety risks or placing children in dangerous homes, and presented evidence that from 2010 to 2011—the years when T.D. was in the DDHS' or Father's custody—the DDHS "had an absence of maltreatment between 99.4 and 98.5% with an average rate of 98.9% for those two years." (ECF No. 135 at 17-19; ECF No. 201 at 13-14; ECF No. 135-2 at ¶ 6.) From this evidence a jury could reasonably infer that a custom of disregarding safety risks or placing children in dangerous homes did not exist, given that the DDHS had such a high rate of absence of maltreatment with respect to the children it placed in 2010 and 2011. *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (explaining that the failure to allege similar discrimination as to others "seriously undermines" a plaintiff's attempt to establish a "continuous, persistent and widespread" custom) (quotations omitted). Moreover, although not relevant to whether the DDHS met its initial summary-judgment burden as to an element of plaintiff's claim, it is notable that nowhere in his response does plaintiff address the DDHS' statistical evidence and, in his response statement of undisputed facts, he concedes the accuracy of said evidence. (*See generally* ECF No. 183 at 12-16; *see* ECF No. 184 at ¶ 11.)

As such, even if the Court had reached this theory of liability, it is without merit, and thus, the DDHS' motion for summary judgment would have been granted as to this issue.

**V.**     **Conclusion**

For the reasons set forth herein, the Court:

GRANTS the DDHS' motion for summary judgment (ECF No. 135).


**SO ORDERED.**

DATED this 16th day of March, 2016.


                                        BY THE COURT:

                                        _____
                                        RAYMOND P. MOORE
                                        United States District Judge